[822 NYS2d 9]

RHONA A. SILVERMAN, Respondent, v BRUCE G. CLARK et al., Appellants, et al., Defendant.

First Department, September 26, 2006

2

## APPEARANCES OF COUNSEL

*Peter L. Gale*, Port Washington, for appellants.

*Rhona A. Silverman*, New York City, pro se, and *McCabe Flynn & Arangio, LLP*, New York City (*William B. Flynn* of counsel), for Rhona A. Silverman, respondent.

## OPINION OF THE COURT

GONZALEZ, J.

In this action for defamation and breach of contract, we must decide whether letters written by defendant Bruce Clark to two former clients disparaging the professional competence of plaintiff, his former associate attorney who had recently resigned from the firm and taken clients with her, are protected by the absolute defense of truth, or by a qualified or absolute privilege. We find that although neither privilege is applicable under the present circumstances, the defamation causes of action must be dismissed because plaintiff failed to raise a triable issue of fact as to the statements' falsity. We also conclude that plaintiff's claim for breach of an oral agreement to pay bonuses should have been dismissed.

The action was brought by plaintiff against her former employers, the law firm of Bruce G. Clark & Associates, P.C. and

Bruce G. Clark, Esq. (Clark), the firm's principal.[1] Plaintiff worked as a nurse from 1979 until 1993, when she enrolled in law school. She graduated in 1996 and was admitted to the bar shortly thereafter. She briefly worked for a New Jersey law firm and then commenced employment with the defendant firm in November 1997. The firm's practice consisted primarily of representing plaintiffs in personal injury litigation, and plaintiff worked as an associate there until June 2001 when she resigned. In her resignation letter, plaintiff cited irreconcilable conflict of interest arising from the fact that she would likely be called as a witness in a future disciplinary proceeding against the firm. In fact, it was plaintiff herself who had filed the complaint with the disciplinary committee alleging that Clark had committed multiple instances of unethical conduct in operating his law practice.[2]

After plaintiff resigned, several clients with pending cases terminated their relationship with the firm and engaged plaintiff as their attorney. Defendants accuse plaintiff of "poaching" these clients and, in several instances, of removing these clients' case files without the firm's permission. In the months following, the parties continued to have disputes over the transfer of files and the firm's claim for its share of legal fees.

In September 2002, plaintiff commenced the instant action alleging that after she resigned from the firm, Clark sent letters to former clients, submitted affidavits in support of attorney lien applications and made comments to various individuals that accused plaintiff of professional incompetence. Plaintiff alleges that these statements by Clark were false and defamatory.

Only three of plaintiff's original causes of action are at issue on this appeal, the first and second cause of action alleging libel per se, and the tenth cause of action alleging breach of an oral agreement to pay bonuses.[3] The libel claims are based on letters sent by Clark to two former clients in November 2001, which

---

1. The action was dismissed against defendant Judith Clark, a determination that is not being challenged on this appeal.

2. According to Clark, no action has been taken by the disciplinary committee against him or the firm as a result of plaintiff's complaint.

3. We have received letters from both parties indicating that while this appeal was pending, this action was tried to conclusion in Supreme Court (this Court having previously denied a stay). The jury dismissed both libel claims, but returned a partial verdict for plaintiff on the breach of contract claim. In view of our holding on this appeal that each of these claims should have been dismissed at the summary judgment stage, it is unnecessary for us to consider the events in the trial court.

essentially disparage plaintiff's legal experience and suggest that those clients would be better served by switching back to his firm.

One letter was to a client named Garrett, which stated in pertinent part:

> "I am sorry to have received your Consent to Change Attorneys appointing Ms. Silverman as your attorney. I will honor that and turn over your file upon Ms. Silverman reimbursing me for my disbursements and recognizing that I have a lien against the attorney's fee for the amount of work done by my office. Unfortunately, she and I have not been able to agree on the division of fees on any cases and must ask a court to decide. . . .

> "You should be aware that Ms. Silverman has been an attorney barely five years. In the three and a half years she was with my firm she won only two cases. In each of those cases there was no defendant to defend against her allegations. In one, the doctor was in a mental institution and in the other she was suing a hospital for its emergency room practices. Both of those cases had been prepared for years by my office before Ms. Silverman became involved. I disbursed approximately $50,000 for disbursements on one of the cases.

> "While she was with me Ms. Silverman lost four cases she took to verdict. She has gone on record as describing her own representation of a client in a childbirth case as 'woefully inadequate.'

> "The first case she tried after she left my office was a major case in which she was representing a young law professor who is dying of cancer that his urologist failed to diagnose. This is the first case she tried where she personally did all of the legal work on the case. I was present at a conference when the judge laughed at Ms. Silverman for misrepresenting that her client was too sick to appear at a deposition when the defendant had surveillance photos showing him teaching a class and traveling to his vacation home in Montreal. Ms. Silverman lost that case. The defendant's attorney told me that Ms. Silverman had not prepared her major witness. The wit-

ness was unfamiliar with the medical records when questioned on cross examination. It is unfortunate that that client has paid the cost of Ms. Silverman's inexperience and lack of preparation.

"On November 7, on your case, a meeting was scheduled among Justice McKeon, the defendant's attorney and the person authorized by the New York City Health and Hospitals Corporation to set an amount for settlement and to settle the case. I was also present to discuss Ms. Silverman's motion to become your attorney. Ms. Silverman was not present. The judge's clerk stated that every time he had attempted to call her, there was no one in her office and her answering machine was full. My calendar person also tried several times without success. We then sent Ms. Silverman a letter telling her that the case was scheduled before Judge McKeon for November 7. I can only conclude that, as Ms. Silverman was notified by my office by letter of the date, that she chose not to be present. Had she been present, the case may well have been settled. It is possible that she chose not to show up because a settlement would have occurred when she had done no work as your attorney of record and would, therefore, only been entitled to a very small fee. If this is true, she placed her own interests above those of yours.

"Because of her unexplained absence, the case was adjourned for over a month. This type of incident sends a message to the defense attorney that if plaintiff's attorney is so low on funds that she cannot afford a secretary and a good answering machine, she might not be able to finance the lawsuit and, therefore, may be easy to negotiate with and settle for a lower figure.

"As I will receive a portion of the fee in your case if Ms. Silverman is able to be successful for you, it is in my interest that you receive the best possible settlement. As I have told you, I represented another client who has essentially the same injury as you. I tried her case and obtained a verdict of $3,500,000. The case was sent back for a new trial by the appellate court. The second time I obtained a verdict of $3,400,000. I tried the case in Nassau

County, a jurisdiction that is much more hostile to plaintiffs than the Bronx. You, therefore, have a very valuable case. Please, for both your sake and mine, take the following precautions:

"1. Ask Ms. Silverman to report to you in writing every development in your case and the scheduling of every event. Tell Ms. Silverman that you wish to be present at every deposition or court conference.

"2. Direct Ms. Silverman in writing not to enter into settlement negotiations on your case without speaking first to you, discussing her settlement strategy, and obtaining your approval of the amounts she will demand and will be willing to settle for.

"3. If Ms. Silverman tells you that the defendants have made an offer of settlement, ask her to so inform you in writing. Ask her to document who was present at the negotiations, what demand she made, what offer was made by the defense, who made the offer, and what recommendation she makes regarding settlement. Ask her to give you reasons. Very often attorneys will verbally report to their client a much lower offer than is actually made by the defendant to soften the client to take the amount the defendant has offered.

"4. Make it very clear to Ms. Silverman that she is not to accept any offer of settlement without your explicit written consent. Malpractice cases are very expensive to try. Very often, new attorneys who have not been winning cases will hasten to accept a low offer to get some money into their till to keep the office open and not be concerned about maximizing the recovery for the client.

"5. I would suggest that before you accept any offer of settlement, you discuss the case with me, at no cost to you, or some other experienced medical malpractice attorney for the sake of having a second opinion and hearing other options. If you feel uncomfortable speaking with me, I could give you the names of several medical malpractice attorneys who would probably be willing to speak with you. Your case is the first oral surgery case that Ms. Silverman will be handling. She does not have experi-

ence in evaluating or trying cases such as this and has very little rapport with the defense bar and the doctors' insurance companies.

"Justice McKeon, the judge handling your case, is a very intelligent and reputable judge. After Ms. Silverman was assigned to him on a recent case for trial, she called into the court saying that her father was taken to the hospital. She had expressed fear to me and Mr. Gale of going before Justice McKeon. Her trial was adjourned. She then spent the day in the office rather than going to the hospital to see her father in the hospital, if he was in the hospital. . . .

"Thank you for having allowed me to represent you. I wish you the best of luck."

The subject of the second cause of action was a letter sent to the parents of an infant client named Lunger, who became paralyzed from the waist down after a spinal tap. This letter was substantially similar to the letter sent to Garrett, including nearly identical paragraphs describing plaintiff's trial record and general inexperience, the incidents involving her being laughed at by a trial judge and her failure to appear at a conference, and the same five precautions outlined in the Garrett letter. The letter to the Lungers included the following additional statements:

"I have heard that Ms. Silverman has not been able to pay her part-time secretary. She owes me tens of thousands of dollars in disbursements on the cases she took from my office. . . .

"[I]f the defendants' attorneys know that the plaintiff's attorney has a record of losing cases and limited experience in trying cases and is not able to finance the great expenses of a medical malpractice trial, they are likely to resist any settlement and force the case to trial as the defendant did in the case that Ms. Silverman just lost. The defendant's judgment was correct in taking that case to trial.

"Another thing I worry about is that Ms. Silverman, in her need for money to pay her secretary and finance other cases, may attempt to settle your case for less than its full value. Your son's case is

worth millions of dollars. It would be criminal to settle the case for anything less. . . .

"Your case is the first dealing with this type of injury that Ms. Silverman will be handling."

Defendants served an answer to the complaint, including several affirmative defenses and counterclaims. Plaintiff moved to strike defendants' answer for failure to comply with discovery, and to dismiss the first and second affirmative defenses and related counterclaims. Defendants cross-moved for summary judgment dismissing the complaint, and to strike portions thereof.

Defendants argued that the first two causes of action should be dismissed because the statements in the Garrett and Lunger letters were protected either by the qualified common interest privilege or by the absolute privilege for statements made during judicial proceedings. They further contended that all of the statements were true or constituted nonactionable opinion or legal advice, and therefore were not defamatory. With respect to the tenth cause of action, defendants argued that the parties' oral agreement did not call for payment of bonuses after plaintiff left the firm. Plaintiff's opposition papers argued that defendants' statements were defamatory per se because they included false statements tending to injure her in her trade and profession and that the asserted privileges were inapplicable.

In a lengthy opinion, Supreme Court granted defendants' motion to the extent of dismissing all of plaintiff's causes of action, except the first, second and tenth. The court found that defendants' assertion of the qualified common interest privilege did not justify summary judgment in their favor, since "the only common interest between Garrett, Lunger, and the law firm is that of a pecuniary interest in the outcome of a law suit." The court determined that whether this pecuniary interest was sufficient to invoke the common interest privilege and, if so, whether plaintiff could establish malice to defeat the privilege, were triable issues of fact. The court also rejected defendants' assertion of absolute privilege, since even though Garrett and the Lungers were involved in judicial proceedings when Clark sent them the letters in November 2001, he was no longer their attorney. Thus, the letters were not sent in the course of a judicial proceeding in which Clark was a litigating party or attorney.

Defendants' alternative argument that they were entitled to summary judgment on the ground the statements were either

true, nonactionable opinion or legal advice was denied because defendants failed to produce evidence that was not dependent on Clark's own credibility. In addition, the court found the many statements casting aspersions on plaintiff's professional ability were susceptible of a defamatory meaning and raised a triable issue as to defamation by implication. With respect to the tenth cause of action, the court found triable issues as to the existence and nature of the alleged oral agreement to pay plaintiff a 10% bonus on any case settled or won as a result of her work.

On appeal, defendants first argue that Supreme Court erred in not dismissing the first and second causes of action because the Garrett and Lunger letters were protected by the qualified common interest privilege. Defendants contend that Clark shared a deep common interest with Garrett and the Lungers, to wit, a successful outcome of their cases. Because the Clark firm's share of the contingent fees in these cases was dependent on their successful resolution, Clark shared the clients' strong interest in obtaining the highest possible verdict or settlement, irrespective of whether he or plaintiff continued as the attorney of record. Because the statements in the letters were protected by the common interest privilege, Clark maintains, plaintiff was required to show that his comments were motivated by malice, a showing she allegedly failed to make.

It is well established that even if a statement is defamatory, a qualified privilege exists where the communication is made to persons who share a common interest in the subject matter (*Foster v Churchill*, 87 NY2d 744, 751 [1996]; *Liberman v Gelstein*, 80 NY2d 429, 437 [1992]; *see also Santavicca v City of Yonkers*, 132 AD2d 656, 657 [1987] ["A qualified privilege arises when a person makes a bona fide communication upon a subject in which he or she has an interest, or a legal, moral, or social duty to speak, and the communication is made to a person having a corresponding interest or duty"]).

The Court of Appeals has upheld the application of the common interest privilege with respect to communications between board members of a tenants' association (*Liberman*, 80 NY2d at 437), between a college administrator and members of a faculty tenure committee (*Stukuls v State of New York*, 42 NY2d 272 [1977]), and between constituent physicians of a health insurance plan (*Shapiro v Health Ins. Plan of Greater N.Y.*, 7 NY2d 56 [1959]). The rationale in applying the privilege in these circumstances is that "so long as the privilege is not abused, the flow of information between persons sharing a common interest should not be impeded" (*Liberman*, 80 NY2d at 437).

The defense of qualified privilege will be defeated, however, where it is demonstrated that the defendant's statements were uttered with malice, which includes either common-law malice (motivated by spite or ill will) or constitutional malice (statements made with a high degree of awareness of their falsity) (*Foster*, 87 NY2d at 751-752).

Having reviewed these authorities, we conclude that the individual pecuniary interests of Garrett, the Lungers and Clark in the successful outcome of their cases do not fall within the common interest privilege. While it cannot be disputed that Clark shared his former clients' interest in obtaining the maximum possible recovery in the lawsuits, it is more accurate to say that their interests *coincided* since they were both seeking the maximum recovery for their own personal shares of the verdict or settlement. Indeed, Clark freely admits that his interest in the success of these lawsuits is strictly a pecuniary one—a higher fee for his firm. Accordingly, since there is no evidence that Clark's personal interest in maximizing the firm's legal fee was commonly shared by Garrett and the Lungers, the common interest privilege does not apply in these circumstances.

Nor should it be overlooked that the common interest privilege has been applied most frequently in circumstances where the alleged defamatory communication itself serves an important public or societal interest (*see Shapiro*, 7 NY2d at 60 [common interest privilege grew out of the desirability in the public interest of encouraging a full and fair statement by persons having a legal or moral duty to communicate information about a person to another]; *Garson v Hendlin*, 141 AD2d 55, 62 [1988], *lv denied* 74 NY2d 603 [1989] [noting a "perceptible social utility" in a communication to an agency concerning the need for a psychological evaluation of subject child]). Although commonly shared pecuniary interests may in certain circumstances give rise to a qualified privilege (*see Foster*, 87 NY2d at 752 [corporation's board of directors shared common interest in protecting and preserving financial health of company]), we find that Clark's personal interest in protecting his legal fees falls well outside of the scope of the common interest privilege (*see* Restatement [Second] of Torts § 594, Comment *g* [defamation of competitor for prospective business advantage not protected by qualified privilege]).

In addition, once the Clark firm was discharged and plaintiff undertook representation of Garrett and the Lungers, the institutional relationship that ordinarily might give rise to a

common interest or duty to speak was all but eliminated. Clark's new role of disgruntled former attorney fundamentally altered his relationship with his former clients, thus rendering any common interest questionable at best. In order for the privilege to apply, "the relation of the parties should be such as to afford reasonable ground for supposing an innocent motive for giving the information, and to deprive the act of an appearance of officious intermeddling with the affairs of others" (*Lewis v Chapman*, 16 NY 369, 375 [1857]). At the time of the communications in this case, the relationship between the parties did not suggest such an innocent motive. Accordingly, we hold that no qualified privilege exists as a matter of law.

■ We agree, however, with Supreme Court's ruling that the Garrett and Lunger letters were not protected by the absolute privilege for statements made in the course of a judicial proceeding. The protective shield of absolute privilege has been construed narrowly by the Court of Appeals to protect only those individuals participating in a public function, such as judicial, legislative or executive proceedings (*see Toker v Pollak*, 44 NY2d 211, 219 [1978]). While defendants note that statements "in the course of" judicial proceedings have been construed to embrace letters between litigating parties and their attorneys, or even remarks made in a court clerk's office concerning a pending proceeding (*Klein v McGauley*, 29 AD2d 418 [1968]), this rule is inapplicable since Clark was neither a litigating party nor an attorney for one of the parties. Tellingly, his own letters acknowledge that he is no longer the attorney for Garrett and Lunger, and we reject his argument that his ancillary role in protecting his fee in these cases clothes him with absolute immunity from a defamation claim.

■ Defendants further contend that the defamation causes of action should have been dismissed because they met their initial burden of showing that the statements in the Garrett and Lunger letters either were true, were not defamatory or were pure opinion as a matter of law, and plaintiff failed to submit evidence raising a triable issue of fact. Defendants are correct. Truth is an absolute defense to a cause of action based on defamation (*Cahill v County of Nassau*, 17 AD3d 497, 498 [2005]; *Yan v Potter*, 2 AD3d 842 [2003]; *Dillon v City of New York*, 261 AD2d 34 [1999]). A review of the complaint and the Garrett and Lunger letters demonstrates that Clark made numerous factual assertions regarding plaintiff's lack of experience and poor record in trying cases, as well as her absence from court confer-

ences and her inability to fund cases as a plaintiff's personal injury lawyer. Nevertheless, in his lengthy affidavit in support of defendants' motion for summary judgment, Clark addressed each of the factual assertions individually and explained why each of them was true. This showing was sufficient to meet defendant's initial burden of demonstrating the defense of truth (*see Yan*, 2 AD3d at 843).

The burden then shifted to the plaintiff to raise a triable issue of fact as to the falsity of these particular statements, a burden she has plainly failed to meet (*id.*; *see also Immuno AG. v Moor-Jankowski*, 77 NY2d 235, 246-247 [1991], *cert denied* 500 US 954 [1991]; *American Preferred Prescription v Health Mgt.*, 252 AD2d 414, 420-421 [1998]). With respect to the Garrett letter, the only "proof" of falsity offered by plaintiff consisted of two statements that did not even mention her. First, she claimed that Clark had untruthfully stated that a case he had previously tried involved "essentially the same injury" as that suffered by Garrett, when in fact the injuries were different. The second instance was Clark's statement that he "obtained a verdict of $3,400,000," which plaintiff claimed was untruthful because the case was eventually settled for only $2 million. Neither of these allegedly false statements by Clark raises a triable issue since neither of them mentions plaintiff, nor was alleged in the complaint as being defamatory, and the words themselves have no defamatory meaning or import. Thus, even if these statements were false, they were irrelevant to the defamation claim.

Regarding the Lunger letter, plaintiff's only allegation of falsity, made exclusively in her attorney's affirmation, related to Clark's statement that "[y]our case is the first dealing with this type of injury that Ms. Silverman will be handling." Plaintiff's counsel argued that this statement was false because plaintiff had previously tried a case involving a similar spinal injury. In Clark's papers however, he explained that his reference to "this type of injury" meant a spinal injury specifically resulting from a flawed spinal tap. In any event, even though this statement does refer to plaintiff and is identified in her complaint as defamatory, no triable issue is raised since this allegation of falsity was raised solely in the affirmation of plaintiff's attorney, who failed to demonstrate personal knowledge of the facts (*see Casteneda v Rubell*, 170 AD2d 205 [1991] [affirmation by attorney having no knowledge of facts is without probative value and cannot defeat summary judgment]).

Moreover, contrary to Supreme Court's holding, there is no requirement that a defendant accused of making defamatory statements must offer corroborative or independent evidence establishing the truth of statements. As defendants aptly note, under our summary judgment jurisprudence, the credibility of a defendant's factual showing of truthfulness does not come into issue until the plaintiff makes it an issue by submitting contradictory evidence. No conflicting facts were offered by plaintiff here.[4]

Not all of Clark's statements were clear assertions of fact, however, and his defense was not always truth. Instead, on several occasions he relied on the defense that the alleged defamatory statements were either nonactionable opinion or proper legal advice. A libel action may be maintained only if it is premised on published assertions of fact (*Brian v Richardson*, 87 NY2d 46, 51 [1995]), and the issue of whether a statement is one of fact or nonactionable opinion is, in the first instance, a question of law for the court (*Millus v Newsday, Inc.*, 89 NY2d 840 [1996], *cert denied* 520 US 1144 [1997]; *Rinaldi v Holt, Rinehart & Winston*, 42 NY2d 369, 381 [1977], *cert denied* 434 US 969 [1977]).

The test to be applied is whether a reasonable reader would conclude that the challenged statements were conveying facts about the libeled plaintiff (*Immuno AG.*, 77 NY2d at 254). In applying this test, courts focus on whether the language has a precise meaning, whether the assertions are capable of being proven true or false, and whether the immediate and broader context indicates to the reader that the statements are likely to be opinion rather than fact (*Steinhilber v Alphonse*, 68 NY2d 283, 292 [1986]).

In the case at bar, we have identified three statements in the Garrett and Lunger letters that require application of this test. The first relates to plaintiff's absence from the November 7 conference, about which Clark states: "It is possible that she chose not to show up" because she had little work on the case and therefore would have "only been entitled to a very small fee. If this is true, she placed her own interests above those of yours." In the second statement, also found in both letters,

---

4. To the extent the Second Department's decision in *Misek-Falkoff v Keller* (153 AD2d 841, 842 [1989]) holds that a witness's affidavit confirming the truth of an alleged libeler's statement is insufficient to meet that defendant's initial burden on a summary judgment motion, we decline to follow it.

Clark states: "Very often, new attorneys who have not been winning cases will hasten to accept a low offer to get some money into their till to keep the office open and not be concerned about maximizing the recovery for the client." The third statement, in the Lunger letter only, provides: "Another thing I worry about is that Ms. Silverman, in her need for money to pay her secretary and finance other cases, may attempt to settle your case for less than its full value."

 Applying the aforementioned three-factor test for opinions, we find that each of the three statements has a precise meaning and, for the most part, is capable of being proven true or false. While these conclusions suggest fact, not opinion, there is still the third factor—the immediate and broader contexts of the statements. Taking the broader context first, we note that the statements were made in a letter from an attorney to a former client who had recently discharged him. The letter is drafted in a serious and cautionary tone, is laden with negative facts about the current attorney, and its obvious purpose is to convince the client to drop that attorney and return the case to the Clark firm. Thus, unlike the situation where the broader context reveals a natural forum for opinion, such as an editorial page or a public hearing (*see Brian*, 87 NY2d at 52-54), the broader context in this instance suggests that Clark's accusations against plaintiff would likely be understood as fact, not opinion.

However, our examination of the final factor—the immediate context of the statements—ultimately leads us to conclude that a reasonable reader would likely believe that Clark was conveying his opinion about plaintiff, not fact. In this regard, defendants point out that the language used by Clark in the three statements strongly suggests nonactionable opinion based on previously stated facts ("It is possible that she chose not to show up . . ."; "If this is true, she placed her own interests above those of yours"; "Another thing I worry about is that [plaintiff] . . . may attempt to settle your case for less than its full value"). It is clear to us that Clark's choice of words was no accident, as it appears that every attempt was made to ensure that his disparaging remarks concerning plaintiff would ultimately be found to be opinion, instead of actionable fact. Such linguistic devices will not guarantee immunity from defamation actions since, even where the utterance is "couched in the language of hypothesis or conclusion," it will still be actionable if it "would be understood by the reasonable reader as assertions of fact" (*Gross v New York Times Co.*, 82 NY2d 146, 154 [1993]).

Nevertheless, based on the language and immediate context of the three statements at issue here, we are constrained to find that a reasonable reader would conclude such statements were conveying the writer's personal opinion, not fact. In the first statement, Clark's use of the phrases "[i]t is possible" and "[i]f this is true" unmistakably signals that Clark is not asserting fact in these circumstances. The language constitutes a concession by the writer that the truth of the statement is unknown. Because of the language used by Clark and his careful insertion of facts to support his assertions, we conclude that a reasonable reader would believe that his statements were "personal surmise built upon those facts" (*Gross*, 82 NY2d at 155), and thus not actionable.[5]

The last two statements express Clark's concern that plaintiff (or "new attorneys" such as plaintiff) might be predisposed to settle cases for less than their value, thereby placing their own interest above that of their clients. Because these statements relate to potential future conduct, they should reasonably be seen as opinions. Nor do they qualify as actionable mixed opinions since, although Clark's prior association with plaintiff might lend itself to the inference that he was aware of a predisposition on her part to act in a manner adverse to her client's interests, he never implied that such view was supported by undisclosed facts (*cf. Guerrero v Carva*, 10 AD3d 105, 114 [2004]). On the contrary, Clark carefully laid out the facts establishing plaintiff's lack of experience and funds, and then expressed his "concern" that such factors might possibly lead to inappropriate conduct in the future. This constitutes pure opinion, which is not actionable (*see Steinhilber*, 68 NY2d at 289; *D'Agostino v Gould*, 158 AD2d 577, 578-579 [1990]). We also reject plaintiff's claim of defamation by implication, which is generally characterized more by misleading omissions and false suggestions (*see Armstrong v Simon & Schuster*, 85 NY2d 373, 380-381 [1995]), as opposed to the direct allegations of inexperience and incompetence present in this case.

The tenth cause of action for breach of contract also should have been dismissed. Plaintiff alleges that she had an oral agreement with the firm whereby she would receive 10% of the fees earned on any cases on which she did substantial work. Defendants counter that the alleged oral agreement never

---

**5.** If the assertion was more inflammatory, such as stating the possibility that plaintiff had committed a crime, perhaps our conclusion would be different (*see Lutz v Watson*, 136 AD2d 888, 889 [1988]).

provided for such 10% bonus to be paid after plaintiff had left the firm. In support of this argument, defendants submitted an affirmation made by plaintiff in another case in which she admitted that the 10% fee arrangement "is not relevant to division of fees after the employees leave his office. It only applies to his relationship with his employee attorneys during the time they work for him." In light of plaintiff's judicial admission that the alleged oral agreement has no application after she left the Clark firm, no triable issue is raised and her cause of action based on this agreement must be dismissed (*Morgenthow & Latham v Bank of N.Y. Co.*, 305 AD2d 74 [2003], *lv denied* 100 NY2d 512 [2003]).

Accordingly, the order of the Supreme Court, New York County (Sherry Klein Heitler, J.), entered on or about July 15, 2004, which, to the extent appealed from as limited by the briefs, denied defendants' motion for summary judgment dismissing the first, second and tenth causes of action, should be reversed, on the law, without costs, the motion granted in its entirety and the complaint dismissed. The Clerk is directed to enter judgment in favor of defendants-appellants dismissing the complaint.

MAZZARELLI, J.P., ANDRIAS and MCGUIRE, JJ., concur.

Order, Supreme Court, New York County, entered on or about July 15, 2004, reversed, on the law, without costs, defendants' motion for summary judgment granted in its entirety and the complaint dismissed. The Clerk is directed to enter judgment in favor of defendants-appellants dismissing the complaint.