[828 NYS2d 315]

Sexter & Warmflash, P.C., et al., Respondents, v William Margrabe et al., Appellants.

First Department, January 4, 2007

## APPEARANCES OF COUNSEL

*Greenberg & Massarelli, LLP*, Purchase (*William Greenberg* and *Crystal Massarelli* of counsel), for appellants.

*Sexter & Warmflash, P.C.*, New York City (*Edward R. Finkelstein* of counsel), for respondents.

## OPINION OF THE COURT

FRIEDMAN, J.

In this defamation action, plaintiff attorneys are suing a former client and her husband based on statements they made in the letter discharging plaintiffs as the wife's attorneys. The letter's allegedly defamatory statements criticized the quality of plaintiffs' representation of the wife in a lawsuit concerning a family business dispute, and asserted that plaintiffs were charging usurious interest on their fees. The letter stated that it was being copied to the wife's brother, whom plaintiffs were representing in the same matter, and two other attorneys defendants had retained for independent advice in that litigation. There is no indication that the letter was published to any other third parties. On these undisputed facts, we hold that the allegedly defamatory statements in the subject letter enjoy the protection of the absolute privilege for statements made in the course of, and relating to, judicial proceedings. Accordingly, we reverse and grant defendants' motion to dismiss the complaint.

Plaintiffs are Sexter & Warmflash, P.C. (S & W), a professional corporation engaged in the practice of law, and two of its attorneys, David Warmflash and Michael Present, Esqs. In April 2001, defendant Elizabeth Margrabe and her brother, Anthony J. Rusciano III (known as Tony), retained S & W to prosecute on their behalf an action against their cousin, Anthony J. Rusciano II (known as A.J.), and the family-owned business entities that he controlled. Ms. Margrabe and Tony Rusciano held minority interests in the family businesses. As recited in S & W's retention letter, dated April 10, 2001, Ms. Margrabe and her brother contemplated litigation in the hope of "extricat[ing] [themselves] from the businesses," i.e., inducing their cousin to buy out their interests. The retention letter noted that S & W had advised Ms. Margrabe and her brother that

"there may be a potential conflict of interest between the two of you relating to the value of each of your interests—and you have advised us that, irrespective of the agreements relating to these business entities, any and all benefits to be derived shall be shared between you equally."

With regard to fees, the April 2001 retention letter provided that S & W would bill Ms. Margrabe and Tony Rusciano, collectively, on a monthly basis, for 50% of S & W's fees as calculated in accordance with the firm's "regular and customary billing rates for similar services." The letter further provided that, when the litigation ended, the clients would pay "an additional amount equal to one hundred percent (100%) of our total legal fees accrued during the course of our representation," based on the same billing rates. "Accordingly," the letter explained, "upon conclusion of this litigation—whether by settlement or following trial—the total legal fees to which [S & W] shall be entitled shall equal one and one-half times the actual legal fees accrued." The retention letter stated that the purpose of this fee arrangement was "to reduce [the clients'] financial burden during the course of this litigation" and "to fairly compensate [S & W] upon conclusion of the litigation for [its] financial accommodations."

In June 2001, S & W, on behalf of Ms. Margrabe and Tony Rusciano, commenced an action in Supreme Court, Westchester County, against A.J. Rusciano and certain of the family business entities (the Westchester County action). Warmflash and Present were the S & W attorneys who handled the case for Ms. Margrabe and her brother. On June 18, 2003, as the matter was about to go to trial, A.J. Rusciano agreed to settle the case, and to purchase Ms. Margrabe's and Tony Rusciano's interests in the businesses, for $8,375,000 and a share of the proceeds of a tax certiorari proceeding. Ms. Margrabe and Tony Rusciano were to receive an initial payment of $1.25 million within 30 days of the closing, with the remainder of the consideration to be paid in installments over 6½ years. The terms of the settlement were immediately placed on the record in open court. Upon questioning by the court, Ms. Margrabe expressed satisfaction with the terms of the settlement and with her representation by S & W.

Within days after the announcement of the settlement, Ms. Margrabe executed a power of attorney appointing her husband, defendant William Margrabe, to serve as her attorney-in-fact for

purposes of approving the formal closing documents to be used to consummate the settlement.[1] Although the negotiations concerning the form of the settlement's final documentation went on for months, Dr. Margrabe (who holds a doctorate in economics) felt that S & W was too willing to accommodate the other side in the interest of closing the deal. It was Dr. Margrabe's perception that, in dealing with opposing counsel, S & W was giving the interest of Tony Rusciano (who was having financial difficulties) in consummating the deal as soon as possible (and the firm's own interest in collecting the balance of its fee) priority over Ms. Margrabe's interest in having the settlement documents provide security arrangements to ensure that all agreed-upon future payments would be made when due.

Notwithstanding Dr. Margrabe's dissatisfaction with S & W, Ms. Margrabe continued to employ the firm for about 10 months after the initial announcement of the settlement in June 2003. Ms. Margrabe did, however, retain two other attorneys to advise her independently regarding certain aspects of the finalization of the settlement. One of these attorneys was Harry D. Lewis, Esq., a bankruptcy practitioner and personal friend of Dr. Margrabe, who agreed to render advice concerning the adequacy of the provisions to secure the future payments called for by the settlement. In his November 2003 retainer agreement with the Margrabes, Lewis (who apparently first became involved in June 2003) disclaimed any expertise "in state court litigation, or in structuring or closing settlements in state court," for which purpose "he advise[d] use of other counsel." The other attorney Ms. Margrabe hired was Philip Halpern, Esq., who, in a retainer letter dated July 2, 2003, stated that he would limit his services "to only a full and complete explanation of the settlement documents created by [S & W] as well as making suggestions for improvements thereon." A subsequent retainer letter, dated April 19, 2004, states that Halpern had previously told the Margrabes that, because he had worked for David Warmflash early in his career, he could not represent Ms. Margrabe in any fee dispute with S & W.

Because the parties to the Westchester County action were unable to agree on the final documentation of their settlement,

---

**1.** Although the record indicates that Ms. Margrabe revoked her husband's June 2003 power of attorney in November of that year, she executed a new power of attorney reappointing him in February 2004. The letter containing the statements for which the Margrabes are being sued states that Dr. Margrabe issued that letter on his wife's behalf pursuant to the February 2004 power of attorney.

the matter was ultimately submitted to the court for decision. By decision and order entered March 29, 2004, the court approved the version of the settlement agreement submitted by A.J. Rusciano's counsel. The order directed the parties and their counsel to execute that agreement and "present the executed agreement to the court for signature."

Over the week and a half following entry of the court's March 29 order, Dr. Margrabe and S & W exchanged a series of increasingly hostile e-mails. Dr. Margrabe, speaking as his wife's attorney-in-fact, expressed the desire to continue litigating the terms of settlement, and stated that his wife would not participate in a closing until the Margrabes received further advice from Halpern, their independent counsel. S & W, on the other hand, regarded the March 29 order as the end of the matter, and insisted on going forward with the closing that the firm had scheduled with opposing counsel for April 15. The final e-mail to Dr. Margrabe from Warmflash of S & W, dated April 9, 2004, tersely stated: "Bill you will not prevent the closing . . . . I will show up with [T]ony [Rusciano] and we will close."

The same day, Dr. Margrabe sent Warmflash and Present of S & W a 12 page, single-spaced letter (the April 9 letter). The letter was written and signed by Dr. Margrabe in his capacity as his wife's attorney-in-fact, and, beneath Dr. Margrabe's signature, also bore Ms. Margrabe's signature after the notation "I have read and approved this letter."[2] The letter terminated S & W's representation of Ms. Margrabe, purportedly "with cause," and objected to S & W's continued representation of Tony Rusciano. The bulk of the April 9 letter comprises a long list of complaints about the alleged deficiencies of S & W's rep-

---

2. The apparent suggestion in S & W's appellate brief that Dr. Margrabe did not sign the April 9 letter as his wife's agent is without merit. Although there is no indication of Dr. Margrabe's representative capacity directly adjacent to his signature on the final page of the letter, the opening paragraph reads as follows:

"On behalf of my wife, Elizabeth Anne Rusciano Margrabe ('Betty'), using the power of attorney that she signed on February 13, 2004, I hereby terminate the employment of the law firm of [S & W], with cause, in the above-styled litigation and related negotiations. Further, on behalf of Betty, I object to [S & W's] continued representation of her co-plaintiff and brother, Anthony J. Rusciano III ('Tony'). The rest of this letter discusses (I) the cause for your termination, (II) why you cannot continue to represent Tony, and (III) Betty's final instructions for you." We reject S & W's unsupported suggestion that Ms. Margrabe's placement of her own signature on the letter is, standing alone, inconsistent with her husband's having issued it as her agent.

resentation of Ms. Margrabe and her brother in the Westchester County action and in the negotiations to settle that action.[3] The "cc" notation at the end of the letter indicates that it was copied to Halpern, Lewis, and Tony Rusciano.

In May 2004, S & W, Warmflash, and Present (collectively, S & W) commenced this action against the Margrabes. The verified complaint asserts a single cause of action, for defamation, based on the following statements made in the Margrabes' April 9 letter:

> "[Y]our proposed drafts were replete with errors, both major errors costly to our interests, and typographical errors embarrassing to putatively 'literate' persons."

> "[Y]ou have been far more adept at thwarting the participation of those lawyers we have engaged to assist you than at following the transparent machinations of opposing counsel."

> "From its inception, your firm's representation of Mrs. Margrabe, and her brother, co-plaintiff Tony Rusciano ('Tony') has been fraught with missteps, poor legal judgments, failure to protect your clients' rights on repeated occasions, and poor, adversarial, or misleading communications with your clients . . . ."

> "[Y]ou contracted to charge your own clients interest in excess of that permitted by New York law on loans related to your fees."

> "From about July 2, 2003 through about November 28, 2003, you manipulated the trust and confidence that Plaintiffs Tony Rusciano and Elizabeth Margrabe jointly placed in you."

> "Repeatedly, you extracted negotiating concessions from Elizabeth, adverse to her interests by reducing the security on her loans of millions of dollars to her thieving and untrustworthy cousin, in order to obtain a chance at quicker cash for the financially desperate Tony."

---

**3.** The Margrabes state that the April 9 letter spells out in detail the basis of their dissatisfaction with S & W's services in order to establish "cause" for discharging the firm, which they anticipated would become an issue in any future litigation concerning S & W's entitlement to the balance of its fee.

"Some of the concessions you offered your adversaries ensured earlier payment of your fees while consigning one of your clients to likely insolvency."

"You have a record of manipulating your clients to further your own interests . . . ."

The verified complaint alleges that the Margrabes published the April 9 letter to Halpern, Lewis, and Tony Rusciano, the third-party recipients indicated in the letter itself. It is also alleged that the statements quoted above are false and defamatory, and "were motivated by actual malice, in that [d]efendants knew that the matters contained therein so published were false and untrue; or were published with reckless and wanton disregard of whether they were false and untrue." Plaintiffs seek damages of not less than $1 million.

In lieu of answering, the Margrabes moved to dismiss the complaint pursuant to CPLR 3211 (a) (1) and (7), among other relief. In support of the motion to dismiss, the Margrabes contended that the contents of their April 9 letter were client confidences or secrets within the meaning of Code of Professional Responsibility DR 4-101 (a) (22 NYCRR 1200.19 [a]). Therefore, the Margrabes argued, the action was barred as a violation of S & W's professional obligation to refrain from revealing Ms. Margrabe's confidences or secrets, and from using those confidences or secrets to Ms. Margrabe's disadvantage or to S & W's advantage, without Ms. Margrabe's consent (*see* DR 4-101 [b] [22 NYCRR 1200.19 (b)]). The Margrabes also argued that their publication of the April 9 letter to Lewis, Halpern, and Tony Rusciano was protected by the qualified privilege extended to communications between persons sharing a common interest (*see Foster v Churchill*, 87 NY2d 744, 751 [1996]). While the Margrabes acknowledged that malice could defeat the common interest privilege, they maintained that the complaint failed to allege sufficient facts from which malice could be inferred so as to defeat the privilege. Finally, the Margrabes argued that the transmission of the April 9 letter to Lewis and Halpern, their attorneys, could not be deemed a publication for purposes of the law of defamation.

In opposition, S & W argued that the contents of the April 9 letter were not client confidences or secrets within the meaning of DR 4-101 (22 NYCRR 1200.19) because the letter was sent to S & W for the purpose of discharging the firm, not for the purpose of obtaining its legal advice. As to the Margrabes' invocation of the qualified common interest privilege, S & W

argued, inter alia, that the privilege provided no basis for dismissing the complaint at the pleading stage, since malice was sufficiently alleged. S & W also disputed the Margrabes' contention that the transmission of the letter to their attorneys did not constitute a publication under the law of defamation. In addition to opposing the dismissal motion, S & W cross-moved for partial summary judgment as to liability. In support of the cross motion, S & W argued that the statements complained of were false and defamatory per se, including the accusation that S & W was charging a usurious rate of interest on its fee. As to the criticisms of the quality of S & W's work, the firm argued that falsity and malice were established as a matter of law by the sworn statements Ms. Margrabe made in the Westchester County action on June 18, 2003, in which she expressed satisfaction both with her representation by S & W in that lawsuit and with the settlement terms S & W had negotiated.

Insofar as appealed from, the IAS court's decision and order, entered on or about March 17, 2005, denied the Margrabes' motion to dismiss, and granted S & W's cross motion for partial summary judgment as to liability solely with respect to the portion of the action based on the usury accusation. We now reverse and dismiss the complaint on the ground that the allegedly defamatory statements in the April 9 letter are protected by the absolute privilege for statements made in the course of, and relating to, judicial proceedings. Although the Margrabes have not argued for dismissal based on the judicial proceedings privilege, we decide the appeal on this ground because the facts that make the absolute privilege applicable appear on the face of the record—indeed, most of those facts are alleged by S & W in the complaint itself—and S & W could not have avoided the effect of the privilege had it been raised by the Margrabes either in the IAS court or on appeal (*see Chateau D' If Corp. v City of New York*, 219 AD2d 205, 209 [1996], *lv denied* 88 NY2d 811 [1996]).

An absolute privilege affords a speaker or writer immunity from liability for an otherwise defamatory statement to which the privilege applies, regardless of the motive with which the statement was made (*see Park Knoll Assoc. v Schmidt*, 59 NY2d 205, 208-209 [1983]; *Toker v Pollak*, 44 NY2d 211, 219 [1978]; *see also* Prosser and Keeton, Torts § 114, at 816 [5th ed] [absolute privilege applies "without regard to (the defendant's) purpose or motive, or the reasonableness of his conduct"]; 2 Dobbs, Torts § 412, at 1153 [2001] [absolute privilege "is not

defeated by the defendant's malice"]). Thus, the protection of an absolute privilege, unlike a qualified privilege, "is not conditioned upon the honest and reasonable belief that the defamatory matter is true or upon the absence of ill will on the part of the actor" (3 Restatement [Second] of Torts, at 243). Absolute privilege has been recognized in "a very few situations where there is an obvious policy in favor of permitting complete freedom of expression, without any inquiry as to the defendant's motives" (Prosser and Keeton, *supra* at 816).

Judicial proceedings are among the settings in which an absolute privilege is recognized. The rule is that "a statement made in the course of legal proceedings is absolutely privileged if it is at all pertinent to the litigation" (*Lacher v Engel*, 33 AD3d 10, 13 [2006], citing *Youmans v Smith*, 153 NY 214, 219 [1897]; *see also Mosesson v Jacob D. Fuchsberg Law Firm*, 257 AD2d 381, 382 [1999], *lv denied* 93 NY2d 808 [1999]; 43A NY Jur 2d, Defamation and Privacy § 154; Kreindler, Rodriguez, Beekman and Cook, New York Law of Torts § 1:50, at 53 [14 West's NY Prac Series 1997]). The privilege extends to judge, jurors, counsel, witnesses, and, as relevant here, the parties to the proceeding (*see Park Knoll Assoc.*, 59 NY2d at 209).[4] The principle underlying the absolute privilege for judicial proceedings is that "the proper administration of justice depends upon freedom of conduct on the part of counsel and parties to litigation," which freedom " 'tends to promote an intelligent administration of justice' " (*People ex rel. Bensky v Warden of City Prison*, 258 NY 55, 59-60 [1932], quoting *Marsh v Ellsworth*, 50 NY 309, 312 [1872]). As a matter of public policy, the possible harm to individuals barred from recovering for defamatory statements made in connection with judicial proceed-

---

4. With regard to Dr. Margrabe, who was not a party to the Westchester County action, we acknowledge that the judicial proceedings privilege generally does not protect a person (other than a judge, juror or witness) who is "neither a litigating party nor an attorney for one of the parties" (*Silverman v Clark*, 35 AD3d 1, 12 [2006] [stating that the judicial proceedings privilege did not protect an attorney who had been discharged as a litigant's counsel, although the complaint was dismissed on other grounds]). Dr. Margrabe, however, in his capacity as his wife's duly appointed agent for purposes of the Westchester County action, was privileged to speak about that lawsuit to the same extent she was (*see* Restatement [Second] of Torts § 890; Restatement [Second] of Agency § 345). We note that all communications between the Margrabes themselves, on any subject, were absolutely privileged based on their status as a married couple (*see* 2 NY PJI2d 3:31, at 353 [2006], citing *Lawler v Merritt*, 182 Misc 648 [1944], *affd* 269 App Div 662 [1945], *Dyer v MacDougall*, 93 F Supp 484 [ED NY 1950], Restatement [Second] of Torts § 592, and Prosser and Keeton, *supra* at 824).

ings is deemed to be "far outweighed by the need . . . to encourage parties to litigation, as well as counsel and witnesses, to speak freely in the course of judicial proceedings" (*Martirano v Frost*, 25 NY2d 505, 508 [1969]).

In view of the public policy to permit persons involved in a judicial proceeding to write and speak about it freely among themselves, pertinent statements made in the course of such proceedings are afforded the protection of privilege, " 'irrespective of the motive' with which [the statements] are made" (*Wiener v Weintraub*, 22 NY2d 330, 331 [1968], quoting *Marsh*, 50 NY at 311; *see also Mosesson*, 257 AD2d at 383; *Ticketmaster Corp. v Lidsky*, 245 AD2d 142 [1997]; *Allan & Allan Arts v Rosenblum*, 201 AD2d 136, 138 [1994], *lv denied* 85 NY2d 921 [1995], *cert denied* 516 US 914 [1995]; 2 NY PJI3d 3:31, *supra* at 349; Kreindler, Rodriguez, Beekman and Cook, *supra* at 53). Stated otherwise, the judicial proceedings privilege is extended to pertinent statements made in the course of litigation "no matter how great the personal malice of the writer" (*Pecue v West*, 233 NY 316, 319 [1922]).

While it is true that the judicial proceedings privilege may be "abused," and, in that event, "protection is withdrawn" (*Youmans*, 153 NY at 220), the authorities make clear that the sole criterion of whether such abuse has occurred is the pertinence of the statement in question to the proceedings.[5] "It is only when the language used goes beyond the bounds of reason and is so clearly impertinent and needlessly defamatory as not to admit of discussion that the privilege is lost" (*Bensky*, 258 NY at 59). Thus, in the case of a defamatory statement that was obviously impertinent to the judicial proceeding in which it was made, the privilege is withdrawn because the malice of the speaker or writer is inferred from the statement's impertinence. However, an offending statement pertinent to the proceeding in which it was made is absolutely privileged, regardless of any malice, bad faith, recklessness or lack of due care with which it was spoken or written, and regardless of its truth or falsity (*see Andrews v Gardiner*, 224 NY 440, 446 [1918] [the "statements

---

**5.** As we recently noted in *Lacher v Engel* (33 AD3d 10 [2006], *supra*), one of this Court's precedents suggests that the privilege may not be extended to a litigant who commences a sham lawsuit for the sole purpose of defaming his adversary (*id.* at 13-14, citing *Halperin v Salvan*, 117 AD2d 544 [1986]). Clearly, no such exception to the privilege could apply in this case, since S & W, which filed the Westchester County action on Ms. Margrabe's behalf, obviously does not allege that the Westchester County action was a sham proceeding.

may have been false, but they were not impertinent"]; *Grasso v Mathew*, 164 AD2d 476, 480 [1991], *lv dismissed* 77 NY2d 940 [1991], *lv denied* 78 NY2d 855 [1991] ["whether true or not, the challenged statement . . . (was) absolutely privileged, as a matter of law"]).

Whether a statement is "at all pertinent to the litigation" (*Mosesson*, 257 AD2d at 382) is determined by an "extremely liberal" test (*Black v Green Harbour Homeowners' Assn., Inc.*, 19 AD3d 962, 963 [2005]). A statement made in the course of judicial proceedings is privileged "if, by any view or under any circumstances, it may be considered pertinent to the litigation" (*Martirano*, 25 NY2d at 507; *see also Lacher*, 33 AD3d at 14). Thus, "the narrow and technical rules normally applied to determine the admissibility of evidence" (*Martirano*, 25 NY2d at 508) are not used to determine a statement's pertinence for purposes of the privilege analysis. To be actionable, a statement made in the course of judicial proceedings "must be so outrageously out of context as to permit one to conclude, from the mere fact that the statement was uttered, that it was motivated by no other desire than to defame" (*id.*; *see also Cavallaro v Pozzi*, 28 AD3d 1075, 1077 [2006]; *Grasso*, 164 AD2d at 479). Stated otherwise, "the possibly pertinent [for purposes of the judicial proceedings privilege] need be neither relevant nor material to the threshold degree required in other areas of the law," and "the barest rationality, divorced from any palpable or pragmatic degree of probability, suffices" to establish the offending statement's pertinence to the litigation (*Seltzer v Fields*, 20 AD2d 60, 62 [1963], *affd* 14 NY2d 624 [1964]; *see also Mosesson*, 257 AD2d at 382; *Grasso*, 164 AD2d at 479; 43A NY Jur 2d, Defamation and Privacy § 154).

The pertinence of a statement made in the course of judicial proceedings is a question of law for the court (*Bensky*, 258 NY at 60; *Mosesson*, 257 AD2d at 382; *Grasso*, 164 AD2d at 479). In answering that question, any doubts are to be resolved in favor of pertinence (*Mosesson*, 257 AD2d at 382, citing *Seltzer*, 20 AD2d at 63; *see also Baratta v Hubbard*, 136 AD2d 467, 469 [1988]). Pertinence is properly determinable on a motion to dismiss addressed to the pleadings and documentary evidence alone (*see e.g. Arts4All, Ltd. v Hancock*, 5 AD3d 106 [2004]; *Carniol v Carniol*, 288 AD2d 421, 422 [2001]; *Impallomeni v Meiselman, Farber, Packman & Eberz*, 272 AD2d 579 [2000], *lv denied* 95 NY2d 764 [2000]; *Ticketmaster Corp. v Lidsky*, 245 AD2d 142 [1997], *supra*; *Lieberman v Hoffman*, 239 AD2d 273

[1997]; *Feldman v Bernham*, 6 AD2d 498, 500 [1958], *affd* 7 NY2d 772 [1959]).

The absolute privilege is not limited to statements made on the record during oral testimony or argument, or set forth in formal litigation documents, such as pleadings, affidavits, and briefs. In the interest of "encourag[ing] parties to litigation to communicate freely in the course of judicial proceedings" (*Grasso*, 164 AD2d at 480), the privilege is extended to all pertinent communications among the parties, counsel, witnesses, and the court. Whether a statement was made in or out of court, was on or off the record, or was made orally or in writing, the rule is the same—the statement, if pertinent to the litigation, is absolutely privileged (*see Martirano v Frost*, 25 NY2d 505 [1969], *supra* [party's unsworn statement in open court]; *Youmans v Smith*, 153 NY 214 [1897], *supra* [letter from attorney to witness subpoenaed for trial]; *Arts4All, Ltd. v Hancock*, 5 AD3d at 108 [letter from witness to judge]; *Impallomeni v Meiselman, Farber, Packman & Eberz*, 272 AD2d at 580 [letter from attorney to judge]; *Lemberg v Blair Communications*, 258 AD2d 291, 292-293 [1999] [out-of-court verbal exchange between attorneys]; *Papa v Regan*, 256 AD2d 452, 453 [1998] [communications among parties to a matrimonial action and their respective counsel]; *Jones Lang Wootton USA v LeBoeuf, Lamb, Greene & MacRae*, 243 AD2d 168, 182-183 [1998], *lv dismissed* 92 NY2d 962 [1998] [statement at settlement conference]; *Caplan v Winslett*, 218 AD2d 148, 152-153 [1996] [out-of-court verbal exchange between attorneys]; *Klein v McGauley*, 29 AD2d 418, 419 [1968] [off-the-record statement by attorney to adverse party in court clerk's office, in presence of others]; *see also O'Brien v Alexander*, 898 F Supp 162, 170, 171 [SD NY 1995], *mod on other grounds* 101 F3d 1479 [2d Cir 1996] [statements by party's representatives to potential trial witnesses; applying New York law]).

As the foregoing authorities would lead one to expect, New York courts have consistently held that a communication of the kind at issue here—a letter among parties and counsel on the subject of pending or prospective litigation—enjoys the protection of the absolute privilege for judicial proceedings. For example, the Third Department recently held that the absolute privilege applied to statements in a letter from the board of directors of a homeowners' association to the association's members reporting on the status of litigation to which the association was a party (*see Black*, 19 AD3d at 963). Similarly, in

*Vodopia v Ziff-Davis Publ. Co.* (243 AD2d 368 [1997]), this Court affirmed the dismissal of an attorney's defamation claim that was based on "a letter written by opposing counsel and sent to [the attorney] and directly to [the attorney's] client during the course of negotiations to settle a copyright lawsuit threatened by [the attorney's] client" (*id.*). We held that the allegedly defamatory statements in the letter were absolutely privileged because the letter was written "in an attempt to settle the claim by [the attorney's] client, and its contents . . . were relevant and pertinent to that claim" (*id.*; *see also Lieberman v Hoffman*, 239 AD2d 273 [1997], *supra* [statements in letter from attorneys to their client's opponent, concerning client's claims against opponent on which suit was contemplated, were absolutely privileged]). The absolute privilege has also been held to apply to statements in a letter concerning ongoing matrimonial litigation from one divorcing spouse to the other and to the writer's own attorney (*see Grasso*, 164 AD2d at 478, 479); and to statements in a letter from an officer of a bankrupt corporation to the corporation's directors, the members of its creditors' committees, and other parties interested in the corporation's bankruptcy case (*see Friedman v Alexander*, 79 AD2d 627, 628 [1980]).[6]

In this case, the allegedly defamatory statements in the April 9 letter concern, on their face, the quality of S & W's representation of Ms. Margrabe and her brother in the Westchester County action and in the negotiations to settle it, and the propriety of S & W's fee arrangement for that representation. The statements were made in a letter that, besides being sent to S & W itself, was "directed solely to parties legitimately involved in the proceeding" with which the letter was concerned (*Friedman*, 79 AD2d at 628), namely, Ms. Margrabe's coplaintiff in the Westchester County action (Tony Rusciano) and the two non-S & W attorneys she had retained for independent advice concerning the settlement of that lawsuit (Lewis and Halpern). Thus, the publication of the statements complained of cannot be said to have been "so outrageously out of context as to permit one to conclude, from the mere fact that the statement[s] w[ere]

---

**6.** *See also Schwartz v Bartle*, 49 Misc 2d 848 (1966) (absolute privilege applied to letters from an informal creditors' committee regarding bankruptcy court proceedings); *Simon v Potts*, 33 Misc 2d 183 (1962) (absolute privilege applied to letter concerning a probate proceeding from attorney for temporary administrator to attorney for testator's widow, which letter was copied to all counsel of record and to the presiding surrogate); *Zirn v Cullom*, 187 Misc 241 (1946) (absolute privilege applied to letter making an offer to settle litigation).

uttered, that [they] w[ere] motivated by no other desire than to defame" (*Martirano*, 25 NY2d at 508). On the contrary, the April 9 letter makes clear that the Margrabes believed (whether rightly or wrongly) that Ms. Margrabe would be disadvantaged if S & W continued to represent Tony Rusciano and persuaded him to consummate the settlement in the form approved by the court. As to the transmission of the letter to Lewis and Halpern, the legitimacy of a client's motive to keep her attorneys fully informed about litigation in which she is involved, and for which the attorneys have been retained to provide advice, requires no elaboration. Plainly, the Margrabes had motives "other [than the] desire . . . to defame" for sharing their criticisms of S & W with Tony Rusciano, Halpern and Lewis.[7] Accordingly, the absolute privilege for statements made in the course of judicial proceedings bars this action.

Before the motion court, the Margrabes argued (without specific mention of the judicial proceedings privilege) that their transmission of the April 9 letter to Lewis and Halpern should not be considered a publication because each of these lawyers had an attorney-client relationship with Ms. Margrabe. In arguing for the legal sufficiency of the complaint, S & W pointed to Halpern's express refusal, based on his prior professional relationship with Warmflash, to represent Ms. Margrabe in any fee dispute with S & W. This limitation on the scope of the attorney-client relationship, S & W contended, showed that the Margrabes sent the letter to Halpern purely out of malice. The motion court appears to have been persuaded by S & W on this score. We find that the limitations of the scope of Halpern's representation cannot, as a matter of law, defeat the application of the judicial proceedings privilege to the April 9 letter.[8]

Notwithstanding any warning Halpern may have given the Margrabes that he would not represent Ms. Margrabe against S

---

**7.** S & W's verified complaint alleges in conclusory fashion, "[u]pon [unspecified] information and belief," that the Margrabes published the April 9 letter to other third parties not yet known to S & W. In opposing the motion to dismiss and on the instant appeal, however, S & W has not relied on this allegation, for which no factual, nonspeculative basis has been offered.

**8.** On appeal, S & W appears to suggest that the subject matter of the April 9 letter was also outside the scope of Lewis's representation. This suggestion is clearly without merit. Not only did Lewis never warn the Margrabes that he could not represent them against S & W, he actually did represent them against S & W in the fee dispute that arose after the firm was discharged. Indeed, in the motion court, Lewis submitted an affidavit in support of the Margrabes stating that, before the April 9 letter was sent, he reviewed it and gave Dr. Margrabe legal advice about its contents.

& W, the fact remains that, at the time the April 9 letter was sent, Halpern was advising Ms. Margrabe on the settlement of the Westchester County action—which was precisely the subject of the April 9 letter.[9] Thus, whatever limitations Halpern had placed on his role in the Westchester County action, the statements in the April 9 letter concerning S & W's handling of that action and the negotiations therein plainly "satisfy the extremely liberal test of being possibly or plausibly relevant or pertinent, by any view of the circumstances, and without reference to technical meaning or strict legal interpretation of the terms relevant or pertinent" (*Grasso*, 164 AD2d at 479). In this regard, it must be borne in mind that the measure of pertinence is what "a reasonable man [i.e., a layperson rather than a lawyer] might think [has sufficient appearance of connection to the case to be] relevant" (*Seltzer*, 20 AD2d at 63; *see also Lacher*, 33 AD3d at 14; *Baratta*, 136 AD2d at 469). Moreover, to reiterate, any doubt is to be resolved in favor of pertinence. In view of these principles, it cannot be said that Halpern's refusal to represent Ms. Margrabe against S & W, by itself, rendered the discussion of S & W's handling of the Westchester County action in the April 9 letter impertinent to the aspects of that lawsuit on which Halpern was advising Ms. Margrabe. Moreover, since the privilege extends to any statement that "may possibly bear on the issues in litigation now or at some future time" (*Seltzer*, 20 AD2d at 62), the possibility (however remote) that Halpern might in the future change his mind and agree to represent Ms. Margrabe against S & W also requires extending the privilege to the transmission of the April 9 letter to Halpern. In short, to restrict the application of the privilege to statements in the April 9 letter based on the bounds of Halpern's role in the Westchester County action would run afoul of Judge Cardozo's admonition that "[t]here is no room in such matters for any strict or narrow test" (*Andrews*, 224 NY at 445).

Because we find that the Margrabes' motion to dismiss the complaint pursuant to CPLR 3211 (a) (1) and (7) should have been granted on the ground that the action is barred by the judicial proceedings privilege as a matter of law, we need not consider the other issues raised by the parties. Among the is-

---

**9.** The retainer letter specifically stating that Halpern would not represent Ms. Margrabe in any fee dispute with S & W is dated April 19, 2004, subsequent to the April 9 letter. While it cannot be determined from the present record when Halpern first placed this limitation on the scope of his employment, we assume, for purposes of this discussion, that he did so prior to April 9, 2004.

sues addressed by the parties that we expressly decline to consider (each of which the motion court decided in S & W's favor) are: (1) whether the action is barred by DR 4-101 (22 NYCRR 1200.19) as an impermissible use of client confidences or secrets; (2) whether the distribution of the April 9 letter to Tony Rusciano, Halpern and Lewis is potentially protected by the qualified "common interest" privilege; (3) whether S & W's fee arrangement was usurious; and (4) whether the usury accusation, if false, constituted defamation per se. We also note that the Margrabes have not argued that any of the allegedly defamatory statements are nonactionable statements of opinion (*see Gross v New York Times Co.*, 82 NY2d 146, 152-154 [1993]), and we therefore have not considered whether such an argument would have merit.

We emphasize that, in deciding this appeal, we express no opinion on the merits of any of the underlying disputes between S & W and the Margrabes, or on the validity of any of the criticisms of the firm expressed by the Margrabes in the April 9 letter. We have considered only whether the allegations of the complaint and the undisputed documentary evidence establish, as a matter of law, that the allegedly defamatory statements in the April 9 letter enjoy the protection of the absolute privilege for pertinent statements made in the course of judicial proceedings. Having determined that the statements are so protected, we are required to dismiss the complaint regardless of any damage to S & W's reputation that may have resulted from the Margrabes' limited distribution of the April 9 letter. This result is necessary to give assurance to all participants in judicial proceedings that they may speak candidly in connection with the proceeding, without fear of incurring liability or the burden of further litigation, thereby ensuring the proper functioning of our adversarial system of justice (*see Martirano*, 25 NY2d at 508-509).

Finally, the Margrabes also appeal from the order entered August 17, 2005, which denied their motion for reargument or renewal. To the extent the August 2005 order is appealable, the appeal from that order is rendered academic by our disposition of the appeal from the March 2005 order. We therefore dismiss the appeal from the August 2005 order.

Accordingly, the order of the Supreme Court, New York County (Shirley Werner Kornreich, J.), entered on or about March 17, 2005, which, insofar as appealed from, denied defendants' motion to dismiss the complaint pursuant to CPLR

3211 (a) (1) and (7), and granted in part plaintiffs' cross motion for partial summary judgment as to liability, should be reversed, on the law, with costs, the motion to dismiss granted, and the cross motion denied in its entirety. The Clerk is directed to enter judgment in favor of defendants dismissing the complaint. The appeal from the order, same court and Justice, entered August 17, 2005, which, insofar as appealable, denied defendants' motion for renewal, should be dismissed, without costs, as academic.

ANDRIAS, J.P., MARLOW, CATTERSON and MALONE, JJ., concur.

Order, Supreme Court, New York County, entered on or about March 17, 2005, reversed, on the law, with costs, defendants' motion to dismiss granted, and plaintiffs' cross motion for partial summary judgment denied in its entirety. The Clerk is directed to enter judgment in favor of defendants dismissing the complaint. Appeal from order, same court, entered August 17, 2005, dismissed, without costs, as academic.

[Next page is 201.]