[841 NYS2d 561]

JORDAN PANEL SYSTEMS CORP., Appellant, v TURNER CONSTRUC-
TION COMPANY, Respondent, et al., Defendant.

First Department, September 18, 2007

## APPEARANCES OF COUNSEL

*O'Connor & Golder, LLP*, Saylorsburg, Pennsylvania (*Terrence J. O'Connor* of counsel), for appellant.

*Peckar & Abramson, P.C.*, New York City (*Gregory H. Chertoff* of counsel), for respondent.

## OPINION OF THE COURT

FRIEDMAN, J.P.

"It is well settled that, if the parties to an agreement do not intend it to be binding upon them until it is reduced to writing and signed by both of them, they are not bound and may not be held liable until it has been written out and signed" (*Scheck v Francis*, 26 NY2d 466, 469-470 [1970]). In this case, in which plaintiff subcontractor sues defendant general contractor for revoking an alleged oral award of a subcontract, undisputed documentary evidence establishes that defendant advised plaintiff—in writing, and in terms that left no room for doubt—that defendant did not intend to be contractually bound to hire plaintiff until both of these highly sophisticated parties had signed the contemplated written agreement. Specifically, defendant plainly and explicitly notified plaintiff, in a preliminary term sheet dated July 11, 2003 (the July 11 term sheet), that the potential subcontract would not be binding on defendant, even *after* any initial award of the job to plaintiff, and even *after* plaintiff's signing of the contemplated written agreement, until defendant had also signed that agreement, an act defendant reserved the right to do (or not do) until October 31, 2003. Although plaintiff alleges that defendant orally awarded it the job on July 14, 2003, neither in the complaint nor in the affidavit opposing the motion to dismiss does plaintiff allege any words or conduct by defendant, before it took plaintiff off the job on July 24, 2003, that would have been inconsistent with the exercise of defendant's expressly reserved right to withdraw

plaintiff's designation as the subcontractor, or that could be construed as a waiver of that right. Accordingly, Supreme Court correctly granted defendant's motion to dismiss the complaint pursuant to CPLR 3211 (a) (1) and (7).

For purposes of this appeal, we assume the truth of the facts alleged in plaintiff's complaint, as amplified by the affidavit plaintiff's president submitted in opposition to defendant's pre-answer motion to dismiss. We also consider the documentary evidence (including the aforementioned July 11 term sheet) that defendant submitted in support of that motion. Plaintiff does not dispute any of this documentary evidence.

This action arises from the effort by defendant Turner Construction Company (Turner) to obtain and then perform the contract to build a steel hangar and technical operations facility for Jet Blue Airways (Jet Blue) at John F. Kennedy International Airport. The project required Turner, through its subcontractors, to both design and build the hangar. Before it was awarded the contract, Turner solicited bids from several subcontractors, including plaintiff Jordan Panel Systems Corp. (Jordan), to design and construct the hangar's structure and cladding, which was the largest component of the project.

Jordan submitted a competitive bid, and negotiations between Turner and Jordan commenced in the summer of 2003. In the course of these negotiations (and before Turner allegedly told Jordan it had been chosen), Turner sent Jordan, among other documents, the aforementioned July 11 term sheet, which contained the following paragraph (the inception paragraph) concerning when any subcontract between Turner and Jordan would become binding on Turner in the event Jordan were awarded the job:

> "The Subcontractor shall firstly execute the [not yet prepared] Subcontract. *Turner reserves the right to not execute this Subcontract pending an internal review and prior approval by the Owner where appropriate. Unless and until Turner Construction Co. executes this Subcontract, Turner shall not be bound by any of the terms or conditions herein.* Subcontractor, however, shall be bound and hereby waives the right to withdraw, rescind or in any way cancel this Subcontract. If Turner does not notify Subcontractor that Turner has executed this Subcontract, either verbally, in writing or by returning a fully executed Subcontract to Subcontractor, on or before

October 31, 2003, Subcontractor may then notify Turner in writing that it shall not be bound by its obligations under this Subcontract. *In such an event neither Turner nor the Subcontractor shall have any liability to the other and Turner shall have no liability to make payments for Work performed by Subcontractor, if any, or for anticipated profits. . . .* Subcontractor shall not be obligated to perform work until Turner executes the Subcontract." (Emphasis added.)[1]

Jordan alleges that, on July 14, 2003, a conference call was held between Turner and Jordan. Prior to that conference call, according to Jordan, the parties had agreed on all material terms of the subcontract except for price. During the July 14 conference call, the parties agreed that Jordan would perform the subcontract for a price of $3.9 million. After that agreement was reached, the complaint alleges, Turner's representatives, in the same telephone conversation, "advised Jordan that it had been awarded the structure/cladding subcontract," and "directed Jordan to proceed with its design development work, to accommodate the Project's 'fast track' schedule."[2]

Promptly after the July 14 conference call, Jordan commenced the design work (there is no claim that physical construction was performed) called for by the July 11 term sheet, in conjunction with its partner in the bid, Bass Construction Company (Bass), and with USA Structures, the company Jordan and Bass had chosen to manufacture the steel building components. A "kickoff meeting" for the project was held on July 22, 2003, which was attended by representatives of Jordan, Bass, USA Structures, Turner, and Turner's joint venturer, the design and engineering firm of Hatch Mott MacDonald Group (Hatch Mott). The representatives of Jordan, Bass and USA Structures left that meeting believing it had gone well.

Only two days later, however, on July 24, 2003, Jordan's president attended a meeting with Turner at which he was told that Turner was terminating Jordan's involvement in the project, and the (as yet unwritten) subcontract was being transferred to Butler Manufacturing Company (Butler). Although Hatch Mott,

---

1. A substantially identical paragraph was included in an earlier term sheet that Turner sent Jordan on or about June 24, 2003.

2. Apparently, at some point prior to the July 14 conference call, Jet Blue had awarded the general contract to Turner. Jordan alleges that it was "[d]ue in large part to Jordan's competitive subcontract price" that Turner succeeded in obtaining the general contract.

Turner's aforementioned joint venturer in the project, regarded Butler as its preferred vendor of steel building components, Butler's bid for the subcontract had been rejected because it was priced substantially higher than Jordan's. Turner told Jordan at the July 24 meeting that, since the oral award of the subcontract to Jordan on July 14, Turner and Hatch Mott had turned over Jordan's work product to Butler and had persuaded Butler to take over the subcontract at the price and terms to which Jordan had agreed. The next day, Turner sent Jordan a letter confirming that the job was being awarded "to a subcontractor that more closely meets the requirements of the contract documents and schedule."

Jordan subsequently commenced this action, asserting against Turner (as relevant to this appeal) causes of action for breach of contract, promissory estoppel, and damages in quasi contract. In lieu of answering, Turner moved, pursuant to CPLR 3211 (a) (1) and (7), to dismiss the complaint based on documentary evidence and for failure to state a cause of action. Turner argued that it was entitled to terminate Jordan as subcontractor because, in the July 11 term sheet, it had clearly stated its intention to become bound only upon signing a "written, formal subcontract," and no such document had ever been drafted or signed. Jordan did not dispute that the July 11 term sheet had the meaning Turner attributed to it, but argued that the term sheet was "supersede[d]" by the oral agreement the parties allegedly reached three days later, on July 14, 2003. Supreme Court agreed with Turner and dismissed the complaint in its entirety. We now affirm.[3]

Jordan concedes that the courts of this State will give effect to a party's clearly stated intention not to be contractually bound until it has executed a formal written agreement. This principle—which recognizes that "when a party gives forthright, reasonable signals that it means to be bound only by a written agreement, courts should not frustrate that intent" (*R.G. Group, Inc. v Horn & Hardart Co.*, 751 F2d 69, 75 [2d Cir 1984] [applying New York law])—is attested by the Court of Appeals' decision in *Scheck v Francis* (26 NY2d 466 [1970], *supra*; *see also Schwartz v Greenberg*, 304 NY 250, 254 [1952]; *Brause v*

---

**3.** Jordan does not appeal from the order under review to the extent it dismissed the causes of action for conversion and deceptive trade practices against Turner. In addition, Jordan has voluntarily discontinued the action as against Hatch Mott, which had been sued for tortious interference and conversion.

*Goldman*, 10 AD2d 328, 332 [1960], *affd* 9 NY2d 620 [1961]), as well as by numerous cases this Court has decided in more recent years.[4] Jordan also concedes, as it did in the motion court, that the inception paragraph of the July 11 term sheet means exactly what it says, namely, that Turner did not intend to become bound by any subcontract with Jordan until that subcontract had been memorialized in a complete, formal writing and Turner itself had signed that writing—a condition that was never satisfied.

The foregoing concessions notwithstanding, Jordan argues that the complaint should be reinstated on the ground that facts have been alleged that, if proven, would establish a waiver by Turner of the provision of the July 11 term sheet that Turner would not be bound by any subcontract until Turner had signed a formal written agreement. Specifically, Jordan refers to the allegations that, during the conference call held on July 14, 2003 (when no written subcontract had yet been prepared), Turner's representatives orally "advised Jordan that it had been awarded the structure/cladding subcontract," and "directed Jordan to proceed with its design development work, to accommodate the Project's 'fast track' schedule." For the reasons that follow, these allegations, assuming their truth, cannot, as a matter of law, save Jordan's complaint.

First, the alleged facts on which Jordan relies—the oral statement during the July 14 conference call that Jordan had been chosen for the job, and Jordan's subsequent commencement of preparatory work at Turner's request—describe a scenario that falls within the terms of the inception paragraph of the July 11 term sheet, and one under which the inception paragraph provided that Turner would *not* become bound. To reiterate, the inception paragraph stated that the designated "Subcontractor" would "firstly" execute the subcontract before Turner did so, and that Turner would then have until the following October 31 to decide whether or not to execute the subcontract itself. In the interim, Turner would not be bound—and thus would be entitled to terminate the relationship at will—"[u]nless and

---

**4.** *See e.g. Prospect St. Ventures I, LLC v Eclipsys Solutions Corp.*, 23 AD3d 213, 213 (2005); *Naturopathic Labs. Intl., Inc. v SSL Ams., Inc.*, 18 AD3d 404, 405 (2005); *Metropolitan Steel Indus. v Citnalta Constr. Corp.*, 302 AD2d 233, 233 (2003); *Farzan v Cassini*, 299 AD2d 239, 239-240 (2002); *Martin Food Distribs. v Berkowitz*, 284 AD2d 240 (2001); *Dratfield v Gibson Greetings*, 269 AD2d 294, 295 (2000); *Hollinger Digital v LookSmart, Ltd.*, 267 AD2d 77 (1999); *LaRuffa v Fleet Bank*, 260 AD2d 299 (1999); *Prestige Foods v Whale Sec. Co.*, 243 AD2d 281, 281-282 (1997).

until Turner . . . execute[d] th[e] Subcontract." Thus, the inception paragraph of the July 11 term sheet made it plain that Turner would *not* become bound when it initially informed a subcontractor that it had been chosen for the job (an event that would naturally precede the subcontractor's signing of an agreement, a stage that was never reached here). The inception paragraph further provided that, in the event Turner ultimately determined not to sign, "neither Turner nor the Subcontractor [would] have any liability to the other and Turner [would] have no liability to make payments for Work performed by Subcontractor, if any, or for anticipated profits." The statement that Turner, if it chose not to execute the subcontract, would have no liability to the subcontractor even if the subcontractor had begun work—indeed, that Turner would not even have to pay the subcontractor for the work it had performed—placed Jordan on notice that its commencement of work would *not* have the effect of binding Turner if Turner had not yet signed. In short, the inception paragraph of the July 11 term sheet specifically addressed the occurrence of events in the nature of the facts alleged in Jordan's complaint, and provided that such events would not have the effect of binding Turner to use Jordan as the subcontractor for the project. Accordingly, the facts alleged by Jordan cannot, as a matter of law, be deemed to give rise to a waiver by Turner of the protection of its written statement that it would be bound only upon its own execution of a formal written subcontract.

Our rejection of Jordan's breach of contract claim is consistent with precedent in which we dismissed a similar claim by a putative subcontractor on the ground that it was "undisputed that the parties were aware that there would be no binding agreement until their execution of a written subcontract, which never occurred" (*Metropolitan Steel Indus. v Citnalta Constr. Corp.*, 302 AD2d at 233, citing *Scheck v Francis, supra*). In *Metropolitan Steel*, we dismissed the putative subcontractor's claim notwithstanding that it, like Jordan in this case, alleged that it had begun performing work for the job (302 AD2d at 233-234; *see also Longo v Shore & Reich, Ltd.*, 25 F3d 94, 96-97 [2d Cir 1994] [under New York law, negotiated employment agreement was not effective without signature on behalf of defendant employer, although plaintiff worked for defendant for three months after she signed the agreement, since defendant's cover letter transmitting the writing to plaintiff "evidenced an intent that the parties would not be bound to the terms of their

negotiations until the agreement was signed" by both of them]). Also significant is our recent holding that a "remark that the 'deal was done,' and that the contract was complete but for the resolution of a pending lawsuit," was insufficient to overcome language in the parties' written communications "provid[ing] that the execution and delivery of an agreement [in writing] would be essential to the existence of a valid and binding contract" (*Naturopathic Labs. Intl., Inc. v SSL Ams., Inc.*, 18 AD3d at 405).

Jordan's position seems to be that any allegation of subsequent dealings between the parties will suffice to raise an issue as to whether a party has waived the protection of a prior written statement that it would not be bound until it signed a formal written agreement. As Jordan apparently would have it, such an issue is raised even if there is no allegation of a statement (even an oral statement) expressly waiving the requirement of a signed formal writing, and even if that requirement was, like the one in this case, expressly formulated to survive precisely the events that are alleged to give rise to the supposed waiver. Far from honoring the principle of freedom of contract to which the dissent refers, this approach would deny a party the ability to define the intended legal effect of its subsequent acts in arm's length, precontractual business dealings, even when that party has given an "objective manifestation[ ] of [its] intent" (*Brown Bros. Elec. Contrs. v Beam Constr. Corp.*, 41 NY2d 397, 399 [1977]) as explicit and unequivocal as the one expressed by Turner in the July 11 term sheet.

Our dissenting colleague, unwilling to accept the plain provisos of the July 11 term sheet, challenges us to explain why the inception paragraph, as "the unilateral expression of one party's position, has such profound, bilateral consequences, preventing both parties from thereafter entering into a binding oral agreement." Although the dissenter professes to find this point "not easy to understand," it has a simple explanation. A "manifestation of mutual assent" by both Turner and Jordan was required to create a binding agreement between them (*see* Restatement [Second] of Contracts §§ 3, 17 [1]). However, if Jordan knew or had reason to know that Turner did not intend to be bound by the conduct the complaint alleges to have constituted Turner's manifestation of assent, there was no manifestation of mutual assent and, therefore, no contract (*see id.* § 20 [1] [b] [no manifestation of mutual assent occurs "if the parties attach materially different meanings to their manifestations

and . . . each party knows or each party has reason to know the meaning attached by the other"]; 1 Farnsworth, Contracts § 3.7, at 213 [3d ed] [where "one *intends* that one's assent have *no* legal consequences," a court "will honor that intention if the other party has reason to know it" or "if the other party actually knows it"]).

Here, Jordan knew from the inception paragraph of the July 11 term sheet that Turner did not intend to be bound by the alleged conduct on which Jordan relies to show the existence of a contract. To reiterate, the inception paragraph plainly stated that Turner would be contractually bound only by its own signature on a written agreement; absent that, Turner would not be bound, even if Jordan had signed a complete subcontract (which never occurred here) or had commenced work. As the Restatement explains: "[I]f either party knows or has reason to know that the other party regards the agreement as incomplete and *intends that no obligation shall exist . . . until the whole has been reduced to another written form*, the preliminary negotiations and agreements do not constitute a contract" (Restatement [Second] of Contracts § 27, Comment *b* [emphasis added]; *see also* 1 Farnsworth, Contracts § 3.8, at 222 ["Courts have generally honored language such as 'not binding until final agreement is executed' as showing an intent not to be bound"]).

What emerges from the foregoing is that, contrary to the dissent's suggestion, the inception paragraph was neither a proposal by one party, to be accepted or rejected by the other, nor, on the other hand, a binding agreement on which the parties had reached a meeting of the minds. Rather, the inception paragraph was Turner's precontractual notice to Jordan of what would constitute Turner's "manifestation of assent" to a binding agreement between the parties. The question presented here is not (as claimed by the dissent) whether it was possible for Turner to waive or change its prior position and abandon the requirement of a signed writing—such a waiver or change of position was, of course, possible—but whether Jordan has alleged any statement or action by Turner that could be deemed to constitute such a change of position. Given the specificity of the inception paragraph, the answer to the latter question must be "no."

There is no reason for us to allow Jordan, a sophisticated corporate entity, to seek to have the benefits of a putative contract judicially bestowed on it based on a set of circumstances that Jordan had been told, in the plainest of terms, would not

give rise to an agreement binding on Turner. To do so would be to negate Turner's prior express limitation of its intent to contract, thereby making, by judicial fiat, a contract that the parties never made for themselves. In this regard, it should be borne in mind that the concept of freedom of contract includes the "[f]reedom to *avoid* oral agreements," a freedom that "is especially important when business entrepreneurs and corporations engage in substantial and complex dealings" (*R.G. Group, Inc. v Horn & Hardart Co.*, 751 F2d at 75 [emphasis added]). Jordan's position, if adopted, would essentially destroy this freedom. We think it preferable to allow sophisticated parties operating in the business world to decide when and how they wish to enter into legally enforceable contracts.[5]

The century-old decision on which Jordan and the dissent rely (*Carlisle v Barnes*, 102 App Div 573 [1905], *appeal dismissed* 183 NY 567 [1906]) is easily distinguishable. In *Carlisle* (a case that apparently has not been cited by any court since 1935), the statement contemplating a written agreement (" 'this is a mere outline of the matter and if you desire to go on with it, we will prepare and sign a formal contract' " [102 App Div at 579]) was far from being an unequivocal expression of an intent not to be bound until the signing of a written agreement, such as Turner made in the July 11 term sheet.[6] In this regard, a clear statement of a party's intent not to be bound until it signs a written agreement, like the one Turner made here, is to be distinguished from a statement that merely refers to the expectation that a writing will be prepared to memorialize an agreement without

---

**5.** The dissent notes that the Second Circuit, in *R.G. Group*, set forth a "list of factors courts have looked to in deciding whether the parties' words and deeds, within a given bargaining context, show an intent to be bound only by a written agreement," and, in that regard, stated that "[n]o single factor is decisive" (751 F2d at 75). The latter statement does not mean that it will be necessary in every case to look beyond an explicit and unambiguous statement of intent not to be bound prior to the execution of a signed formal agreement. *R.G. Group* prominently relied on *Reprosystem, B.V. v SCM Corp.* (727 F2d 257 [2d Cir 1984], *cert denied* 469 US 828 [1984]), a decision written by the same judge earlier the same year. As noted in *R.G. Group* (751 F2d at 75), *Reprosystem* held that, in that case, the parties' written communications, by themselves, "*conclusively establish[ed]* a mutual intent not to be bound prior to execution of the formal documents" (727 F2d at 262 [emphasis added]).

**6.** We disclaim any suggestion that authority of *Carlisle*'s vintage should never be cited. We merely point out that the weakness of the dissent's position is demonstrated by its using as the linchpin of its argument a single decision written 102 years ago, and last cited by a court 72 years ago, when so many more recent cases point in precisely the opposite direction.

conditioning the agreement's binding effect on the completion and signing of such a writing (*see Matter of Municipal Consultants & Publs. v Town of Ramapo*, 47 NY2d 144, 149 [1979]). We also observe that the statements from the Williston and Corbin treatises quoted by the dissent do not appear to have application to the undisputed facts of this case, in which, as previously discussed, not only was the requirement of a signed writing stated unequivocally and never expressly waived, the requirement was formulated to survive events of precisely the kind that are alleged to have given rise to an unwritten agreement.

In attacking our position, the dissent seems to attribute to us the view that the conditions of the inception paragraph were "all but immutable" and could never be waived by Turner under any set of alleged facts. We say nothing of the kind. Rather, the ground of our decision is that, in this case, as a matter of law, Jordan has not alleged that Turner either said or did anything that could have constituted such a waiver. Stated otherwise, the facts alleged by Jordan, assuming them to be true, did not, as a matter of law, waive the conditions of the inception paragraph, either expressly or by implication.

As the dissent concedes, Jordan does not allege that Turner made any statement, either written or oral, expressly waiving that condition.[7] Neither has Jordan alleged facts that could support a finding of implied waiver. It may well be that, under some imaginable set of facts in some other case, conditions to the existence of a binding contract such as those set forth in the inception paragraph could be waived by inconsistent conduct not taking the form of an expressly articulated waiver. The problem for Jordan is that it simply does not allege that Turner engaged in any conduct inconsistent with its subsequent reliance on the inception paragraph to avoid being contractually bound. To use the dissent's phrase, there is no allegation here of any conduct giving "more or less explicit . . . signals" that

---

7. The dissent, while acknowledging that "Jordan could not honestly allege an express waiver," slips the suggestion of express waiver back into its analysis by referring to "assurances" Jordan supposedly received from Turner. However, neither the complaint nor the affidavit of Jordan's president alleges that Jordan received any "assurances" from Turner at all, much less an "assurance" that Turner would not rely on the inception paragraph's requirement of a signed written agreement.

the requirements of the inception paragraph were being dropped.[8]

We cannot agree with the dissent's suggestion that Turner's alleged request during the July 14 conference call that Jordan begin work "immediately," or even the acceptance of the product of such work, could be found to constitute a waiver of the requirement of a signed writing. Obviously, if it is true that Turner dismissed Jordan after Jordan commenced work at Turner's request, such conduct could not be considered exemplary business practice. Nonetheless, we again emphasize that the inception paragraph expressly contemplated the possibility that Jordan would begin work before Turner executed a subcontract, and provided that, in such an event, Turner would still have no liability to Jordan if Turner ultimately decided to proceed with a different subcontractor. Jordan, as a sophisticated party not in need of judicial tutelage, should not be relieved of the consequence of this provision simply because Turner asked it to begin work. If Jordan, before it commenced work on the project, wished to have a real assurance from Turner that Turner in fact "regarded [the requirement of a signed writing] as a technicality that had been superseded" (the dissent's phrase), Jordan easily could have requested that Turner expressly waive the conditions of the inception paragraph. Having chosen to begin work at a point when it knew that neither party was contractually bound (neither having executed a subcontract), Jordan voluntarily assumed the risk that Turner would ultimately enter into a subcontract with another company. The dissent never explains why Jordan should be relieved of the risk it knowingly assumed by commencing work without obtaining such an express waiver. To paraphrase

---

**8.** The dissent repeatedly asserts that, in dismissing Jordan's complaint, we are implicitly casting doubt on the concept of implied waiver. We do no such thing. All we hold is that, in this particular case, given the detailed conditions set forth in the inception paragraph, Jordan has not alleged facts that could support a finding of an implied waiver by Turner of the requirement of a signed written agreement. We have no occasion to consider whether a different set of allegations would have raised an issue of fact as to implied waiver of the conditions the inception paragraph placed on Turner's becoming bound; we deal only with the facts alleged in Jordan's complaint. We do not regard this as a "hedg[ing]" of our position, but as following the customary judicial practice of restricting our discussion to the particular allegations before us. We see no basis for the dissent's suggestion that our present holding impairs the concept of implied waiver as a legal principle. After all, *Hadden v Consolidated Edison Co. of N.Y.* (45 NY2d 466 [1978]), which the dissent cites for its recognition that a legal right may be waived either expressly or by implication, found that no waiver had occurred in that case.

language the dissenter used in another case, Jordan "acted at [its] own peril in construing [the request to commence work] as a proxy for an assurance" that Turner was dispensing with the requirement of a written and signed subcontract (*Smalley v Dreyfus Corp.*, 40 AD3d 99, 108 [2007, McGuire, J., concurring in part and dissenting in part], *lv granted* 2007 NY Slip Op 70262[U] [1st Dept 2007]). This, we think, sufficiently "come[s] to grips" (to use the dissent's term) with Jordan's allegation of partial performance.[9]

The dissent seems to believe that, by giving the inception paragraph effect in accordance with its plain terms, we are giving it a "fanciful" reading of "extravagant sweep," indeed, even rewriting it. We disagree. The inception paragraph begins with the following sentence: "The Subcontractor shall firstly execute the Subcontract."[10] Further, the inception paragraph expressly provides that, in the event Turner does not sign a subcontract, "Turner shall have no liability to make payments for Work performed by Subcontractor, if any, or for anticipated profits." It seems plain to us, if not to the dissent, that, in ordinary course, a subcontractor would execute a subcontract or commence work only after being told that the general contractor was awarding it the job. Nonetheless, the inception paragraph informed Jordan that Turner would not be bound, even after Jordan had signed a subcontract or commenced work, until Turner had also executed the subcontract at some point after

---

**9.** The dissent reads illusory significance into the complaint's conclusory allegation that Jordan's commencement of work while Turner prepared a formal subcontract "was in conformance with a prior course of dealing between Turner and Jordan on other projects." While it may be that the parties' preliminary dealings on prior projects had resulted in signed written agreements, this does not mean that the preliminary dealings alleged here resulted in a deal binding on Turner when, in this case, the requirement of a written agreement signed by Turner was never satisfied. Notably, neither the complaint nor the affidavit of Jordan's president alleges that the two companies had a prior course of dealing in which Turner waived such a condition to its becoming bound. In fact, Jordan's president states in his affidavit—in apparent contradiction to the complaint's allegation about a "prior course of dealing"—that the "normal procedure," which Turner did not follow in this case, was to have the parties' agreement "reduced to a formal writing." Also misplaced is the dissent's focus on the fact that, when Turner asked Jordan to begin work, Turner "knew that it previously had taken the position that it would be bound only if it signed a written agreement." This fact, of course, was known, not only to Turner, but also to Jordan, as was the fact that, under the inception paragraph, Turner would not be bound even if Jordan began work before Turner had signed a written subcontract.

**10.** Notably, in this case, the parties did not even reach the initial stage of having the putative "Subcontractor" (Jordan) execute a subcontract.

Jordan did so. Again, Turner had until October 31, more than three months after the July 14 conference call, to decide whether or not to sign. More fundamentally, if the inception paragraph was not intended to establish that Turner would not be bound by a verbal statement (or, as the dissent prefers, an "assurance") that Jordan had the job, the requirement of a written agreement signed by Turner was essentially meaningless. Thus, we see no basis for the dissent's refusal to acknowledge that the facts alleged by Jordan are entirely within the contemplation of the inception paragraph rather than constituting some new and independent act of waiver.[11]

As previously discussed, all we hold here is that the particular allegations made by Jordan do not, as a matter of law, amount to a waiver of Turner's requirement that there be a signed subcontract before Turner would be contractually bound. To reiterate, Turner had every right to unilaterally impose such a condition on its becoming bound because, at the time the condition was imposed—when Turner sent Jordan the July 11 term sheet—it is undisputed that no contract between the parties was in existence. Stated otherwise, Turner, prior to entering into a contract with Jordan, was entitled to give Jordan a notice expressly limiting the legal effect of Turner's subsequent oral statements and nonverbal acts. The dissent would hold that, on the basis of the paltry facts alleged by Jordan, a factfinder may interpret the parties' dealings after the giving of such notice as if that notice had never been given. To so hold would essentially reduce a notice such as the inception paragraph of the July 11 term sheet, no matter how explicit, to a dead letter. In essence, the dissent would deprive commercially sophisticated parties dealing at arm's length of the ability to avoid extended litigation over whether they had entered into oral or implied-in-fact contracts. This we decline to do.

The dissent pleads on Jordan's behalf that "[s]hort of . . . an allegation [of an express waiver], it is not clear what more Jordan could have alleged" to raise an issue of waiver. We think it more pertinent to ask what more Turner could have said in the inception paragraph to avoid liability for breach of an oral or implied-in-fact contract. Again, the inception paragraph placed Jordan on notice, before any contract is alleged to have

---

**11.** While the dissent may be able to posit a hypothetical scenario in which a subcontractor executes a subcontract without having been told that it has been chosen for the job, this does not serve to turn the inception paragraph on its head so as to render Turner bound by its alleged oral statements to Jordan.

come into being, that "[u]nless and until Turner . . . executes this Subcontract, Turner shall not be bound by any of the terms or conditions herein," and, moreover, that, prior to Turner becoming so bound, it "shall have no liability to make payments for Work performed by [Jordan], if any, or for anticipated profits." The effect of the dissent's approach is to allow the factfinder to analyze Turner's subsequent conduct as if Turner had never given Jordan these notices. In the context of arm's length bargaining between sophisticated commercial entities, we see no justification for such nullification of the express limitations one party placed on the conditions under which it would become contractually bound.

Other than the ancient (and apparently anomalous) *Carlisle* case, the dissent does not cite a single decision holding that a plain and unequivocal written statement that a party will not be contractually bound until it has signed a written agreement may be overridden, depending on the inclinations of a factfinder in subsequent litigation, by alleged conduct of a kind the stated condition was specifically formulated to survive, and without any allegation of an express waiver, either written or oral, of that condition. Further, the dissent cannot convincingly distinguish the numerous cases we cite that uphold a party's right to attach the condition of a signed writing to its becoming contractually bound. In each of these cases, one party unsuccessfully attempted to enforce an alleged oral or implied-in-fact agreement in the face of the other party's undisputed prior statement that it would not be bound without a signed writing. These cases establish that the bare allegation of an oral or implied-in-fact agreement—which is really all that Jordan alleges here—does not raise an issue of fact as to whether there was a waiver of the requirement of a signed writing.[12]

Supreme Court was also correct in dismissing Jordan's promissory estoppel and quasi contract causes of action. For the reasons discussed above, Jordan could not reasonably have relied upon Turner's statements during the July 14 conference

---

12. When one looks past the dissent's argumentative embellishments of the record, the claim that Jordan's complaint and affidavit offer more than the bare allegation of an oral or implied-in-fact agreement is based on nothing more than Jordan's commencement of design work prior to the preparation and signing of a written subcontract. As we have already explained at length, the inception paragraph specifically provided that no binding contract would be created by Jordan's commencement of work before Turner signed a written agreement. We consider this a reasoned basis for rejecting the dissent's position.

call as an unambiguous promise to enter into a subcontract with Jordan; therefore, no cause of action for promissory estoppel has been stated (*see Hollinger Digital v LookSmart, Ltd.,* 267 AD2d at 77; *Chatterjee Fund Mgt. v Dimensional Media Assoc.,* 260 AD2d 159, 159-160 [1999]; *Prestige Foods v Whale Sec. Co.,* 243 AD2d at 281-282). Similarly legally insufficient is the cause of action seeking recovery in quantum meruit for the preparatory work Jordan performed before July 24, 2003. In light of the statement in the July 11 term sheet that, if Turner did not sign a subcontract with Jordan, "Turner shall have no liability to make payments for Work performed by [Jordan], if any," Jordan could not have had any reasonable expectation of compensation for the work it performed in the absence of such a signed subcontract (*see Metropolitan Steel,* 302 AD2d at 233-234; *Absher Constr. Corp. v Colin,* 233 AD2d 279, 280 [1996]).[13] We note that Jordan's argument based on the implied covenant of good faith and fair dealing is misplaced, since the July 11 term sheet establishes that, as a matter of law, the facts alleged by Jordan did not give rise to any contract between the parties (*see Prestige Foods,* 243 AD2d at 281-282; *see also Sheth v New York Life Ins. Co.,* 273 AD2d 72, 73 [2000] [a claim for breach of the implied covenant of good faith and fair dealing "may not be used as a substitute for a nonviable claim of breach of contract"]).

In closing, we acknowledge that Turner's dealings with Jordan, if the allegations of the complaint are true, leave much to be desired. If this case called for the application of equitable principles, we would likely reach a considerably different result. We are, however, dealing with a situation in which specific conditions, in writing, set forth the parties' rules of engagement. Contrary to the dissent's assertions, we did not write those rules of engagement, and we are not empowered either to ignore or rewrite them.

Accordingly, the order of the Supreme Court, New York County (Herman Cahn, J.), entered July 15, 2005, which, insofar as appealed from, granted Turner's motion, pursuant to CPLR 3211 (a) (1) and (7), to dismiss Jordan's causes of action for breach of contract, promissory estoppel, and recovery in quasi contract, should be affirmed, with costs.

---

**13.** The dissent's reliance on *Longo v Shore & Reich, Ltd.* (25 F3d 94 [1994], *supra*) is misplaced. While a quantum meruit recovery was permitted in *Longo*, the Second Circuit's decision does not indicate that the plaintiff in that case was ever told that she would not be compensated for work performed in the absence of a signed written agreement.

McGuire, J. (dissenting). I respectfully dissent. It was undisputed on Turner's motion to dismiss pursuant to CPLR 3211 (a) (1) and (7) both that Turner's term sheet documents expressly required a fully executed, written contract before it would be obligated, and that the written proposal submitted by Jordan to Turner stated that it was contingent on a written agreement. This appeal, however, turns on events occurring after these documents were exchanged by the parties. Jordan's allegations, which must be accepted as true for purposes of Turner's motion to dismiss (*Leon v Martinez,* 84 NY2d 83, 87-88 [1994]), include the allegation that during a conference call on July 14, 2003—which followed a nine-hour meeting on July 9, 2003 between representatives of both parties at which agreement was reached on all terms and conditions of the subcontract other than price—the parties agreed on price and two of Turner's representatives, each of whom is named in the complaint, advised Jordan that it had been awarded the subcontract.

The complaint also alleges that during the same conference call these representatives of Turner "directed Jordan to proceed with its design development work [under the subcontract], to accommodate the Project's 'fast track' schedule." Further, the complaint alleges that Jordan complied with Turner's instructions and promptly began work under the subcontract. As Jordan's principal states in the affidavit he submitted in opposition to the motion:

> "I agreed to accept the [verbal] award, and I followed their explicit instructions to start work immediately, because according to Turner, they were already pressed for time. I never would have undertaken performance of the contract if it had not been for Turner's verbal directives, and our mutual agreement. That is not to say that we contemplated a strictly verbal subcontract . . . . During the discussion of July 14, 2003, we agreed that while Jordan was proceeding with the work, Turner would start the process of drafting the formalized subcontract, and that once it was ready, (in approximately two weeks) it would be reduced to writing and then mutually executed. According to Turner . . . it had to be done this way in order for Turner to facilitate the schedule demands of the Project."

The complaint goes on to allege that after Jordan thus performed work under the contract and attended a "kickoff

meeting" in Texas on July 22, 2003 with Turner's representatives, Jordan's partner and others at which "a substantial amount of design development and coordination was accomplished," Jordan's principal returned to New York. There, on July 24, 2003, Jordan's principal met with Jason Farrell—one of the two representatives of Turner who participated in the July 14 conference call—and Nick Walsh, another executive of Turner. According to the complaint, Walsh admitted that throughout the period of Jordan's performance under the contract, Turner and another entity had been meeting in secret with another subcontractor and had shared all of Jordan's work product with the subcontractor in an effort to induce it to take over Jordan's subcontract at the price and terms to which Jordan had agreed.

That subcontractor had so agreed, and Farrell informed Jordan's principal that Jordan was "being terminated from the Project." As the complaint alleges, at this meeting Farrell "acknowledged that on July 14, 2003, he had awarded the subcontract to Jordan" and "conceded that Jordan had relied upon that order [*sic*]." One other factual assertion made by Jordan should be noted. In his affidavit, Jordan's principal asserts that during the July 24 meeting, Farrell "indicated that it was not he who made the decision to take the contract away from Jordan" and "was visibly embarrassed at the way his company had acted in this case."

As Supreme Court correctly observed, "[i]t is well settled that, if the parties to an agreement do not intend it to be binding upon them until it is reduced to writing and signed by both of them, they are not bound and may not be held liable until it has been written out and signed" (2005 NY Slip Op 30122[U], *6, quoting *Scheck v Francis*, 26 NY2d 466, 469-470 [1970]). As discussed below, however, this case is not controlled by the holding in *Scheck v Francis*. Rather, the question here is one that is not addressed in *Scheck v Francis* or in any of the other cases upon which the majority relies: whether a party to a proposed contract, having initially taken the position that it would not be bound except by a written agreement, may thereafter waive that position, i.e., change its position and manifest its intention to be bound in the absence of a written agreement.[1]

---

1. The issue of whether a party that initially takes the position that it will be bound only if it executes a written agreement thereafter can alter or waive that position is not even mentioned in any of the cases upon which the major-

The notion that such an initial position or agreement cements the parties' relationship, so as thereafter to prevent them from reaching a binding oral agreement regardless of ensuing business exigencies or developments, makes little if any sense. Nor would an inflexible rule to that effect accord with first principles of contract law. To the contrary, "[f]reedom of contract prevails in an arm's length transaction between sophisticated parties . . . and in the absence of countervailing public policy concerns there is no reason to relieve them of the consequences of their bargain" (*Oppenheimer & Co. v Oppenheim, Appel, Dixon & Co.,* 86 NY2d 685, 695 [1995]).

Although there apparently is a dearth of case law on point, Jordan's reliance on our decision in *Carlisle v Barnes* (102 App Div 573 [1905], *appeal dismissed* 183 NY 567 [1906]) is well-founded. There, the plaintiff sent the defendant a letter outlining the terms and conditions of legal work the plaintiff proposed to perform for the defendant. The letter closed with the following sentence: "Of course, this is a mere outline of the matter and if you desire to go on with it, we will prepare and sign a formal agreement" (*id.* at 578-579). This clear but initial indication that a written agreement was contemplated, however, did not prevent this Court from finding that the parties thereafter entered into a binding oral agreement:

> "[S]hortly after the defendant received that letter, he and the plaintiff had a conversation in which the defendant accepted the terms of the letter and agreed to furnish to the plaintiff the details necessary for him to take [the contemplated legal work]. . . . If the plaintiff's version of the conversation be true (and the jury have found it is), then it is apparent that there was a waiver of a written agreement. An agreement to contract is, of course, not a final contract, because something is left open; but where all the terms are settled, and what each party is to do is fully understood and agreed upon,

---

ity relies. Nor do any of those cases present a factual situation in which a party that had made clear its intent to be bound only by a signed, written agreement thereafter advised the other party that it was awarding the contract to that party, directed that performance begin and accepted the benefits of the ensuing partial performance. Accordingly, the cases the majority cites are not controlling. Moreover, as the Court of Appeals has stated, "each case, as it arises, must be viewed and decided according to its own particular facts and circumstances, and will become a controlling precedent, only, where the facts are the same" (*Roosa v Harrington,* 171 NY 341, 350 [1902]).

although a written instrument may have been in contemplation, the execution of such an instrument is not absolutely required to make a binding contract, if the condition of a writing is waived" (102 App Div at 579-580).

As Jordan also points out, the leading treatises on the law of contracts similarly support its position that an initial agreement by the parties that a written agreement would be required hardly creates an insuperable barrier to the validity of a subsequent, oral agreement (*see* 1 Williston, Contracts § 4:11, at 514-515 [4th ed 2007] ["(W)here both parties undertake to act pursuant to a preliminary agreement, they have been held bound despite the fact that a formal contract was never executed, on the theory that even where both parties originally contemplate the execution of a writing, a subsequent agreement, manifested by mutual acts, may dispense with the required writing" (footnotes omitted)]; 1 Corbin, Contracts § 2.9, at 154-155 [1993 rev ed] ["The subsequent conduct and interpretation of the parties themselves may be decisive of the question as to whether a contract has been made, even though a document was contemplated and has never been executed. They may both have already begun performance and may have made statements that are strongly evidential. Of course, the subsequent conduct of the parties may constitute a tacit contract on the terms previously agreed upon, even though the understanding at first had been that the execution of a formal document was necessary" (footnotes omitted)]).

The majority "easily" distinguishes *Carlisle* by stressing that "the statement contemplating a written agreement . . . was far from being an unequivocal expression of an intent not to be bound until the signing of a written agreement, such as Turner made in the July 11 term sheet."[2] On the majority's view of the law, apparently, if one of the parties

---

**2.** The majority also refers, not with veneration, to *Carlisle v Barnes* as an "ancient" decision. The author of the majority's opinion, however, has consistently evidenced considerable respect for decisions as old or older than *Carlisle,* citing and quoting from such decisions in numerous other opinions (*see* e.g. *Sexter & Warmflash, P.C. v Margrabe,* 38 AD3d 163, 171, 172 [2007]; *Lincoln Life & Annuity Co. of N.Y. v Caswell,* 31 AD3d 1, 5, 6 [2006]; *Sakele Bros. v Safdie,* 302 AD2d 20, 25, 27 [2002]; *Computer Possibilities Unlimited v Mobil Oil Corp.,* 301 AD2d 70, 78 [2002], *lv denied* 100 NY2d 504 [2003]; *Parlato v Equitable Life Assur. Socy. of U.S.,* 299 AD2d 108, 115 [2002], *lv denied* 99 NY2d 508 [2003]). Although the majority contends that "so many more recent cases point in precisely the opposite direction" than *Carlisle,* the reality is that *Carlisle* is the precedent that is most closely on point.

negotiating a contract makes a statement evidencing that it contemplates signing a written agreement, the parties nonetheless are able thereafter to enter into a binding oral agreement; but if one of the parties makes a statement unequivocally expressing its intent not to be bound until a written agreement is signed, the parties essentially are disabled thereafter from entering into a binding oral agreement. Only an express waiver, apparently, will suffice. It is not easy to understand, however, why the utterance of this latter statement, the unilateral expression of one party's position, has such profound, bilateral consequences, preventing both parties from thereafter entering into a binding oral agreement. Why the utterance—be it orally or in writing—of the latter but not the former statement carries with it such significant consequences is surely a matter that requires explanation. The explanation the majority proffers reduces to the proposition that as a matter of law no rational trier of fact could conclude that Turner had waived its initial position "[g]iven the specificity of the inception paragraph." As discussed below, however, the majority's analysis of the inception paragraph is erroneous.

The majority brushes aside the above-quoted statements from Williston and Corbin on the ground that, for two reasons, the statements "do not appear to have application to the undisputed facts of this case." First, in this case, the "requirement of a signed writing [was] stated unequivocally and never expressly waived." Second, the requirement "was formulated to survive events of precisely the kind that are alleged to have given rise to an unwritten agreement." On both counts, the majority is not persuasive.

As for Turner never having "expressly waived" the position (or, to use the majority's term, "requirement") that it would be bound only if it signed the subcontract, the clear implication of the majority's position is that a valid oral agreement might have arisen if there had been such a waiver. Indeed, the majority appears to concede that an express oral waiver of the need for Turner's signature on a written agreement would be effective. In any event, the point cannot be doubted. After all, it makes no sense to suppose that the law of contracts forbids a party from waiving or forgoing a position or requirement the party was not required to take or propose in the first instance. Moreover, and more generally, "excepting instances where there would be transgressions of public policy, all rights and privileges

to which one is legally entitled, *ex contractu* or *ex debito justitiae,* may be waived" (*Hadden v Consolidated Edison Co. of N.Y.,* 45 NY2d 466, 469 [1978] [citations omitted]).

But if an express waiver by Turner during the July 14 conference call (i.e., "we hereby award the subcontract to you and waive our prior insistence that we will not be bound until we actually sign the subcontract") would be valid, it cannot be that only such a waiver is valid and that an implied waiver is invalid. To the contrary, a waiver not only need not be express, it need not be expressed in words (*see id.* ["A waiver, the intentional relinquishment of a known right, may be accomplished by express agreement or by such conduct or failure to act as to evince an intent not to claim the purported advantage" (citations omitted)]). The majority not only does not argue otherwise, it expressly acknowledges the concept of implied waiver, but purports to hold only that "in this particular case, given the detailed conditions set forth in the inception paragraph, Jordan has not alleged facts that could support a finding of an implied waiver by Turner of the requirement of a signed written agreement."

That a waiver could be found on the facts alleged is clear. In essence, Jordan alleges that during the July 14 conference call, the parties reached agreement on price; that Turner's representatives assured Jordan that the subcontract had been awarded to it; and that Turner's representatives, concerned about meeting the project's timetable and knowing Jordan would incur significant costs, directed that Jordan immediately begin work under the subcontract. Obviously, moreover, when Turner gave these assurances and instructions it knew that it previously had taken the position that it would be bound only if it signed a written agreement.

On the basis of these allegations alone, Turner's motion to dismiss should have been denied. Whether Turner, by its words, and its conduct, evinced its "intent not to claim the . . . advantage" (*Hadden,* 45 NY2d at 469) of its earlier insistence on a fully executed agreement is an issue that should not have been resolved against Jordan on Turner's motion to dismiss (*see Bono v Cucinella,* 298 AD2d 483, 484 [2002] ["the question of whether waiver has occurred is generally a question left to the finder of fact" (citation omitted)]; *see also Joseph F. Egan, Inc. v City of New York,* 17 NY2d 90, 96 [1966] ["enough evidence was produced to make the questions of waiver and estoppel fair

questions of fact for the jury(;) (n)o rule of law precludes such a waiver" (citations omitted)]).³

By virtue of its other allegations, Jordan's case for a waiver is even more compelling. First, Jordan alleged in the complaint that, consistent with a prior course of dealings between the parties, Turner began the preparation of a formal, written subcontract simultaneous with Jordan's commencement of work under the verbally-awarded subcontract. This allegation is of more than passing relevance to Jordan's waiver argument. In *Simon & Son Upholstery v 601 W. Assoc.* (268 AD2d 359 [2000]), the landlord argued that the written lease prohibited the tenant's use of the premises as a photography studio as the lease specified a different use and contained nonwaiver and merger clauses (*id.* at 359-360). This Court rejected that argument, because "[w]hile no explicit consent can be found in the record, it is clear from the course of dealings between the parties that the landlord consented to the use of the premises for a studio" (*id.* at 359; *see also Coldwell Banker Residential Real Estate v Berner,* 202 AD2d 949, 952 [1994] ["there is a material triable issue of fact as to whether the parties implicitly agreed to extend the Brokerage Agreement beyond the 60-day period as a result of their course of dealings" (citation omitted)]; *New Moon Shipping Co., Ltd. v MAN B & W Diesel AG,* 121 F3d 24, 31 [2d Cir 1997] ["Typically, a course of dealings analysis focuses on the actions of the parties with respect to a specific issue that the parties may have encountered before. On this basis, a factfinder could reasonably infer that the parties have impliedly

---

3. It is not obvious why Jordan should shoulder the burden of showing an intentional relinquishment by Turner of its known right not to be bound except pursuant to a written and fully executed agreement. As a general matter, a party asserting an oral agreement is not required to establish such a waiver by the party assertedly bound. To the contrary, "the existence of a binding contract is not dependent on the subjective intent" of the parties (*Brown Bros. Elec. Contrs. v Beam Constr. Corp.,* 41 NY2d 397, 399 [1977]). Rather, "[in] determining whether the parties entered into a contractual agreement and what were its terms, it is necessary to look . . . to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds" (*id.* [citations omitted]). On the other hand, the initial expression by Turner of its position that it would not be bound unless it signed the subcontract cannot rationally be ignored in resolving the question of whether the parties thereafter entered into a binding, oral agreement. The burden, moreover, is presumably justified as well by the need to give sufficient breathing room to the "[f]reedom to avoid oral agreements" (*R.G. Group, Inc. v Horn & Hardart Co.,* 751 F2d 69, 75 [2d Cir 1984]).

incorporated this understanding into their subsequent contracts"]).[4]

Furthermore, as noted, Jordan's principal swore as follows in his affidavit:

> "During the discussion of July 14, 2003, we agreed that while Jordan was proceeding with the work, Turner would start the process of drafting the formalized subcontract, and that once it was ready, (in approximately two weeks) it would be reduced to writing and then mutually executed. According to Turner . . . it had to be done this way in order for Turner to facilitate the schedule demands of the Project."

Thus, Jordan does more than allege that Turner previously had verbally awarded a subcontract to it that thereafter was memorialized in a written agreement. From Jordan's express allegations, it is reasonable to infer both that Turner knew Jordan would not work for two weeks under the subcontract unless it assured Jordan that the subcontract had been awarded to it, and that Turner's statements about the "formalized" agreement being mutually executed after it was reduced to writing were designed to assure Jordan that it need not be concerned about Turner's prior insistence on a signed agreement. That these are inferences rather than express allegations is of no legal moment for three reasons. First, on this motion by Turner to dismiss pursuant to CPLR 3211, we are required to accord Jordan "the benefit of every possible favorable inference" (*Leon v Martinez*, 84 NY2d at 87).[5] Second, given the evidentiary material submitted on the motion to dismiss, the issue is whether Jordan has a cause of action, not whether it has stated one (*see Guggenheimer v Ginzburg*, 43 NY2d 268, 275 [1977]). Third, as noted above, "the question of whether waiver has occurred is

---

4. On the basis of the course of dealings, this Court also stated that there were "sufficient indicia that the reasonable expectations of both parties under the original lease were supplanted by subsequent actions" (268 AD2d at 360). Jordan's argument is far less ambitious than the argument of the tenant that this Court accepted in *Simon & Son Upholstery*. It argues only that the reasonable expectations of both parties as reflected by their original positions— not a binding, written agreement—"were supplanted by subsequent actions."

5. The majority simply dismisses the inferences I would draw as "argumentative embellishments" of the record. Unfortunately, a reasoned discussion of whether the inferences are reasonable is not possible given the conclusory character of the majority's dismissal of my position that these inferences are reasonable ones we are required to draw.

generally a question left to the finder of fact" (*Bono,* 298 AD2d at 484).

Another highly relevant allegation, one with which the majority fails to come to grips, is Jordan's allegation that Turner induced its partial performance in the course of assuring Jordan that it had been awarded the subcontract. As a panel of the Second Circuit has stated in construing New York law, courts have looked to a number of factors "in deciding whether the parties' words and deeds, within a given bargaining context, show an intent to be bound only by a written agreement" (*R.G. Group, Inc. v Horn & Hardart Co.,* 751 F2d at 75). Although "[n]o single factor is decisive," a "factor of major significance is whether one party has partially performed, and that performance has been accepted by the party disclaiming the contract" (*id.*). As the panel explained, "partial performance is an unmistakable signal that one party believes there is a contract; and the party who accepts performance signals, by that act, that it also understands a contract to be in effect" (*id.* at 75-76). Another factor "is whether there was literally nothing left to negotiate or settle, so that all that remained to be done was to sign what had already been fully agreed to" (*id.* at 76).

Both of these factors support Jordan's position. Specifically, it alleges that partial performance "promptly began" after the July 14 conference call, with Jordan calling, traveling to and attending a "kickoff meeting" in Texas on July 22—a meeting attended by Turner and other of the entities involved in the project—at which "[a] substantial amount of design development and coordination was accomplished . . . , including the incorporation and coordination of a large 'Megadoor' as well as receipt of new specifications for walls, roofs, structure and a new building footprint." Although Jordan does not expressly allege Turner's acceptance of this partial performance, Turner's acceptance fairly can be inferred from Jordan's complaint. As for whether there was anything left to negotiate when Turner informed Jordan during the July 14 conference call that it had been awarded the subcontract, Jordan alleged that nothing remained to be negotiated. Specifically, Jordan alleged that during an earlier nine-hour meeting on July 9, all terms and conditions other than price were agreed upon; that Turner then requested Jordan's "best and final price" for its work; and that "the subcontract deal was closed at 3.9 million dollars" during the July 14 conference call.

Against all this, the majority does not dispute either Jordan's partial performance or its acceptance by Turner. Indeed, the

majority concedes that "Jordan commenced the design work" but seeks to minimize the importance of Jordan's partial performance by immediately going on to note that "there is no claim that physical construction was performed [by Jordan]." Indeed, the majority quotes the following statement from the opinion in *R.G. Group*: "when a party gives forthright, reasonable signals that it means to be bound only by a written agreement, courts should not frustrate that intent" (751 F2d at 75). This factor, however, enjoys no talismanic significance such that courts never may frustrate that party's intent. Rather, "[n]o single fact is decisive," although "considerable weight is put on a party's explicit statement that it reserves the right to be bound only when a written agreement is signed" (*id.*; *see also Brown Bros. Elec. Contrs.*, 41 NY2d at 399-400 [in determining whether the parties entered into a contract "disproportionate emphasis is not to be put on any single act, phrase or other expression, but, instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain" (citations omitted)]).

Moreover, to give conclusive effect to such an explicit statement makes no sense when "[w]hat matters are the parties' expressed intentions, the words and deeds which constitute objective signs in a given set of circumstances" (*R.G. Group*, 751 F2d at 74). Obviously, moreover, and as this case illustrates, "forthright, reasonable signals that [a party] means to be bound only by a written agreement" (*id.* at 75) can be followed by more or less explicit contrary signals. Even if there may be a reason to give greater weight to the initial rather than the later signal, there cannot be any good reason—and the majority does not suggest one—for giving it conclusive weight. Nor could it be given conclusive weight without vitiating the settled, general principle that "excepting instances where there would be transgressions of public policy, all rights and privileges to which one is legally entitled, *ex contractu* or *ex debito justitiae*, may be waived." (*Hadden*, 45 NY2d at 469.)

The majority is dismissive of Jordan's "paltry" factual allegations and the inferences to be drawn from them. Presumably, it regards *Bono v Cucinella* (*supra*) and *Joseph F. Egan, Inc. v City of New York* (*supra*) as beside the point, given its claim that "as a matter of law, Jordan has not alleged that Turner either said or did anything that could have constituted . . . a waiver." Indeed, the majority goes so far as to assert that "the bare allegation of an oral or implied-in-fact agreement . . . is

really all that Jordan alleges here."[6] I respectfully disagree. As is evident, Jordan could not honestly allege an express waiver. Short of such an allegation, it is not clear what more Jordan could have alleged. In any event, a rational jury could conclude from Jordan's factual allegations that during the July 14 conference call Turner's representatives not only "evince[d] an intent not to claim the purported advantage" (*Hadden,* 45 NY2d at 469) of a signed agreement, they also made clear that they regarded it as a technicality that had been superseded both by the parties' oral agreement and the exigencies of their joint endeavor, and that Jordan should regard it as superseded for the same reasons.

As for the majority's other basis for distinguishing the views of the Williston and Corbin treatises—its assertion that Turner's requirement of a signed writing "was formulated to survive events of *precisely* the kind that are alleged to have given rise to an unwritten agreement" (emphasis added)—it reflects a fanciful reading of what the majority styles as the "inception paragraph" of the July 11 term sheet submitted by Turner.[7] The majority reads that paragraph as if it contained the following sentence:

---

**6.** In addition, the majority writes that "[t]he problem for Jordan is that it simply does not allege that Turner engaged in any conduct inconsistent with its subsequent reliance on the inception paragraph to avoid being contractually bound." As discussed below, the majority's reliance on the "inception paragraph" is misplaced. It should be noted, however, that this contention of the majority is also at odds with Jordan's reliance on Turner's representative having been "visibly embarrassed at the way his company had acted in this case." That embarrassment cannot easily be reconciled with the notion that Turner unabashedly or consistently relied on the "inception paragraph."

**7.** Similarly, the majority asserts that the provisions of the "inception paragraph" requiring a fully executed agreement were "*expressly* formulated to survive *precisely* the events that are alleged to give rise to the supposed waiver" (emphasis added). Elsewhere in its opinion, to the same effect, the majority writes that the "inception paragraph . . . *specifically* addressed the occurrence of events in the nature of the facts alleged in Jordan's complaint" (emphasis added). Other characterizations by the majority of the "inception paragraph" are equally curious. Thus, the majority refers to Turner's "expressly reserved right to withdraw [Jordan's] designation as the subcontractor," despite the absence of any such language in the "inception paragraph." Indeed, the paragraph makes no mention of a "designation" by Turner of a subcontractor, let alone either a "withdraw[al]" of such a designation or such an "expressly reserved right." Relatedly, and contrary to the majority's suggestions, the inception paragraph does not refer to any "initial award" of the subcontract. Nor does it refer to a subcontractor being "initially informed" either of an award of the subcontract or that it had been chosen as the subcontractor. By contrast, the critical fact in this case is that Jordan alleges that following lengthy negotiating sessions, Turner's representatives

"The provisions of this paragraph stating that Turner shall have no liability to Subcontractor unless and until Turner executes the Subcontract shall not under any circumstances whatsoever be affected, modified or waived by any subsequent statements or conduct by Turner, and such provisions shall apply and be of full force and effect even if Turner: (1) notifies Subcontractor that Subcontractor has been awarded the Subcontract, (2) knowing that Subcontractor thereby will incur significant expenses, directs that Subcontractor immediately begin work under the Subcontract to meet urgent contractual deadlines, and (3) assures Subcontractor that it need not be concerned about the formality of a fully executed Subcontract."

The majority quotes the "inception paragraph" at some length and, as is apparent, no such sentence can be found in it. Nor can pithier, less specific versions of such a sentence be found. For example, it does not state that "[t]he provisions of this paragraph stating that Turner shall have no liability to Subcontractor unless and until Turner executes the Subcontract shall not under any circumstances whatsoever be affected, modified or waived by any subsequent statements or conduct by Turner." Nor does it state that,

"no matter what Turner otherwise may say or do, Subcontractor shall not under any circumstances believe any oral representation by Turner that the Subcontract has been awarded to it, even if Turner importunes Subcontractor to begin work under the Subcontract, represents that the successful completion of the project requires that Subcontractor begin to perform while the written agreement is formalized, and purports to assure or agree with Subcontractor that a written agreement will be executed once it is reduced to writing."

---

told Jordan that it had been awarded the contract and directed that it begin work. Neither that award nor that direction is "expressly," "precisely" or "specifically" addressed in the inception paragraph.

Finally, an "initial award" of the subcontract is not even a necessary condition to the formation of a contract in accordance with the inception paragraph. To pose just one possibility, suppose that the general contractor requested each of several subcontractors to execute the subcontract while it continued to evaluate their proposals, explaining that it was essential to move quickly once the proposals were fully evaluated. Surely a rational subcontractor might agree to execute the proposed agreement under such circumstances.

Nonetheless, the majority "see[s] no basis for the dissent's refusal to acknowledge that the facts alleged by Jordan are entirely within the contemplation of the inception paragraph." Indeed, the majority even wonders "what more Turner could have said in the inception paragraph to avoid liability for breach of an oral or implied-in-fact contract."

The extravagant sweep of the majority's reading of the "inception paragraph" can be illustrated by supposing that Jordan had alleged that the chief executive officer of Turner had stated, either during the conference call or in a faxed transmission, as follows: "Turner hereby awards the subcontract to Jordan and withdraws its previous insistence that it will not be bound until it executes a written agreement; Turner entreats Jordan to begin work immediately so we can collectively meet the fast-track schedule of this project." Presumably, the majority would not assert that the "inception paragraph . . . specifically addressed the occurrence of events in the nature of [these] alleged [facts]," that the "inception paragraph" was "expressly formulated to survive precisely [such alleged] events" or that by virtue of the "inception paragraph" Jordan "had been told, in the plainest of terms," that such circumstances "would not give rise to an agreement binding on Turner." Nothing in the majority's sweeping account of the "inception paragraph," however, stands in the way of any of these manifestly false assertions.

In fact, the "inception paragraph" simply states that the subcontractor shall first execute the subcontract; that Turner reserves the right not to execute it and shall not be bound "[u]nless and until" it executes the subcontract; that the subcontractor shall be bound for a defined period of time after it executes but may opt out by so notifying Turner in writing if Turner does not, by a specified date, notify the subcontractor that it has executed the subcontract or return an executed subcontract to the subcontractor. The paragraph goes on to provide, in language the majority highlights, that in the event the subcontractor so notifies Turner in writing, "neither Turner nor the Subcontractor shall have any liability to the other and Turner shall have no liability to make payments for Work performed by Subcontractor, if any, or for anticipated profits."

Of course, this last provision contemplates the possibility that a subcontractor might perform under the subcontract prior to its execution by Turner, and notifies prospective subcontractors that Turner's position is that it will not have to pay for the

work. Although it unquestionably would apply to a subcontractor that unilaterally determined to commence work in anticipation of Turner's execution of the subcontract, for the reason stated I cannot agree that it would apply to all conceivable circumstances in which a subcontractor performed work prior to execution of the subcontract by Turner. But more fundamentally, I cannot in any event agree that this "precontractual notice," to use the majority's phrase, is one that Turner could not thereafter modify, retract or waive, that it somehow became all but immutable, at least absent an express waiver, once it was initially stated by Turner.

In this regard, it is remarkable that the majority pronounces that "[w]e are . . . dealing with a situation in which specific conditions, in writing, set forth the parties' rules of engagement" and that "we are not empowered either to ignore or rewrite [those rules of engagement]." The majority thus elevates Turner's initial position, the one it unilaterally proposed in its term sheet, into a binding "rule of engagement." The majority never affirmatively states that the law will recognize an implied waiver of this initial position. Rather, it so assiduously hedges its position with respect to whether Turner could waive this ostensible "rule of engagement" once it first was articulated, that it is far from clear whether even the parties are "empowered . . . to . . . rewrite" it under the majority's approach. I could not agree more with the majority when it states, "[w]e think it preferable to allow sophisticated parties operating in the business world to decide when and how they wish to enter into legally enforceable contracts" (footnote omitted).

The irony is that the majority pronounces itself without authority to rewrite a "rule of engagement" that the majority itself has authored, one that inexplicably interferes with the very principle to which the majority appeals, i.e., that "sophisticated parties operating in the business world [should be free] to decide [for themselves] when and how they wish to enter into legally enforceable contracts." After all, Jordan essentially alleges that after Turner at first stated that it only would be bound if it signed a written subcontract, Turner withdrew or waived that position and awarded the subcontract to it. If these and Jordan's other supporting factual allegations are true, and we are required to assume they are (*Leon v Martinez*, 84 NY2d at 87), the oral agreement the parties intended to enter should be recognized. Instead, the majority refuses to do so on the ground that it would "negate Turner's prior express limitation

of its intent to contract, thereby making, by judicial fiat, a contract that the parties never made for themselves." But if Jordan's factual allegations are true, the majority, by "judicial fiat," prevents the parties from making a contract that they actually did make for themselves.

I agree with the majority that "freedom of contract includes the '[f]reedom to *avoid* oral agreements,' a freedom that 'is especially important when business entrepreneurs and corporations engage in substantial and complex dealings' (*R.G. Group, Inc. v Horn & Hardart Co.,* 751 F2d at 75 [emphasis added])." However one might appraise the relative importance of the freedom to avoid and the freedom to enter oral agreements, the majority presumably agrees that the ability to enter into binding oral agreements also is a matter of commercial importance. The majority's contention that adopting Jordan's position would "essentially destroy" the freedom to avoid oral agreements is hyperbole founded on the majority's caricature of Jordan's position. Contrary to the majority, Jordan's position certainly does not "seem[ ] to be" the artless if not silly one "that any allegation of subsequent dealings between the parties will suffice to raise an issue as to whether a party has waived the protection of a prior written statement that it would not be bound until it signed a formal written agreement." To the contrary, Jordan's position is a rather more sophisticated one. As outlined above, it relies on, inter alia, an express verbal award of the subcontract; Turner's direction that Jordan begin work immediately; Turner's unquestionable awareness of its own prior position that it would be bound only by a signed statement; a consistent prior course of dealing between the parties; statements by Turner that fairly can be viewed as designed to assure Jordan that the drafting and execution of a written subcontract had become an unimportant formality; the other inferences noted above; and Jordan's partial performance, accepted by Turner, under the subcontract.[8]

Despite its disavowal of any holding that an implied waiver of Turner's initial position cannot be valid, the majority nonethe-

---

**8.** Nor for that matter do I or would I "hold that . . . a factfinder may interpret the parties' dealings after the giving of such notice [that it would be bound only by a signed agreement] as if that notice had never been given." The majority is similarly wrong to assert that "[t]he effect of the dissent's approach is to allow the factfinder to analyze Turner's subsequent conduct as if Turner had never given Jordan these notices." On the assumption I must have been unclear for the majority so to mistake my position, I will restate it: the giving of such notice is an important fact, but not one of such decisive

less protests that "[t]he dissent never explains why Jordan should be relieved of the risk it knowingly assumed by commencing work without obtaining such an express waiver."[9] Of course, however, if an implied waiver can be valid, why Jordan did not obtain an express waiver need not be explained. Thus, the majority is not making any valid legal point in stating that "Jordan easily could have requested that Turner expressly waive" its initial position.

Although Jordan thus is not required to provide such an explanation, the record hardly is inscrutable on the matter. Clearly, Jordan did not make such a request at least in part because it believed the representations of Turner's representatives that it had been awarded the subcontract, that it was vital to commence work immediately and that the "formalized subcontract" would be mutually executed once it was reduced to writing. As Jordan's principal swore, "I never would have undertaken performance of the contract if it had not been for Turner's verbal directives, and our mutual agreement." In addition, the complaint alleges that Jordan's commencement of work while the formal, written subcontract was being prepared "was in conformance with a prior course of dealing between Turner and Jordan on other projects."[10] Despite the sophistication the

importance as to preclude thereafter anything but an express waiver or renunciation.

**9.** This protest is not only at odds with the majority's disavowal, it is more than a little ironic given that the majority also charges that I "slip[ ] the suggestion of express waiver back into [my] analysis by referring to 'assurances' Jordan supposedly received from Turner." In making this charge, the majority embraces with gusto the adage that the best defense is a good offense. The majority, after all, repeatedly suggests that only an express waiver could be valid. To provide another example, in the course of imputing to Jordan a position it clearly does not espouse, the majority writes that "[a]s Jordan apparently would have it, such an issue [of waiver] is raised even if there is no allegation of a statement (even an oral statement) expressly waiving the requirement of a signed formal writing." As for the "assurances" to which I refer, I certainly do not suggest they were explicit. To the contrary, my point is that statements made by Turner's representatives during the July 14 conference call fairly can be viewed as designed to assure Jordan that the drafting and execution of a written subcontract had become an unimportant formality.

**10.** Even as the majority suggests there can be no explanation for Jordan's not requesting an express waiver, it asserts that I "read[ ] illusory significance" into this very allegation. But far from endowing it with decisive significance, I merely insist that it was one of the numerous allegations of fact that must be accepted as true and that collectively could warrant a finding by a jury that Turner had engaged in "such conduct . . . as to evince an intent not to claim the purported advantage" (*Hadden,* 45 NY2d at 469) of its initial position. On this score, I note that, contrary to the majority's claim, there is no

majority attributes to Jordan, its decision to take Turner's representatives at their word and commence performance, like any decision it may have made not to request an express waiver, clearly was ingenuous. But if the truth of Jordan's allegations is accepted, as it must be, the fact that it made an ingenuous or even a dumb decision should not deprive it of any opportunity to establish an implied waiver.

As for the majority's statement that "the dissent cannot convincingly distinguish the numerous cases [the majority] cite[s] that uphold a party's right to attach the condition of a signed writing to its becoming contractually bound," I disagree (or, to use the majority's more colorful phrase, "refus[e] to acknowledge" it is correct). I distinguish those cases precisely on the ground identified by the majority. That is, in each of them one party's "undisputed prior statement that it would not be bound without a signed writing" was countered only with "the bare allegation of an oral or implied-in-fact agreement." Here, Jordan alleges much more than that, and the majority cannot convincingly contend otherwise. Neither Jordan nor Turner cites a precedent that is indistinguishable on its facts, but neither party's position is invalidated for that reason. Moreover, *Carlisle* (*supra*) is the precedent that is most closely on point.

Accordingly, in my view, Supreme Court erred in concluding that Jordan's breach of contract claim—and, more specifically, its allegation that a binding oral agreement had been entered into—was "flatly contradicted" by Turner's documentary evidence (2005 NY Slip Op 30122[U], *8). Contrary to the majority's apparent conclusion, the parties were not irretrievably committed to the terms of the "inception paragraph."[11]

"*apparent* contradiction" (emphasis added) between this allegation and the affidavit of Jordan's president. Indeed, the only reasonable conclusion on this motion to dismiss is that the "normal procedure" mentioned in the affidavit ("that the agreement would ultimately be reduced to a formal writing") is itself a reference to the prior course of dealing pursuant to which Jordan began work for Turner before a written contract was executed. On illusory matters generally, I behold with wonder the majority's sleight of hand in paraphrasing a fragment of a sentence I wrote in an opinion in a fraudulent inducement case that has nothing at all to do with the subject of whether a party waived a right relating to contract formation. If the majority searched my writings, I'm surprised it thought it should take the trouble; if not, I'm flattered the majority found my words so memorable.

11. Whether plaintiff can prove a binding oral agreement is a fact-bound matter (*see generally R.G. Group, Inc. v Horn & Hardart Co.,* 751 F2d at 74-77) that is not now before this Court on plaintiff's appeal from the order

Finally, Supreme Court also erred in dismissing Jordan's promissory estoppel and quasi contract causes of action on the ground that Jordan could not have reasonably relied on the statements by Turner's agents that the subcontract had been awarded to it. If, as I believe, it cannot be said as a matter of law that no binding oral agreement could have arisen as a result of those statements, the direction to Jordan to begin work immediately to accommodate the exigencies of the project and the other facts alleged in the complaint, it also follows that the causes of action for promissory estoppel and quasi contract should not have been dismissed.

In concluding otherwise, the majority confers breathtaking powers on the proposed terms of the inception paragraph. Notwithstanding Turner's own subsequent words and conduct, the initial and unilateral proposal by Turner not only has the effect Turner intended of precluding any action asserting a binding oral agreement, it precludes these noncontractual causes of action as well. Notably, the majority's position is contradicted by one of the decisions upon which it relies in rejecting Jordan's contract claim. In *Longo v Shore & Reich, Ltd.* (25 F3d 94, 97-98 [2d Cir 1994]), the Second Circuit, construing New York law, held that because the parties that negotiated an employment agreement did not intend to become bound by the agreement unless it was written and signed, the plaintiff's claim for breach of contract properly was dismissed on the employer's motion for summary judgment despite the plaintiff having worked for the defendant for three months.[12] With respect to the plaintiff's claim that she was entitled to recover in quantum meruit, however, the court held that she was entitled to recover on a theory of quasi contract. The District Court's contrary conclusion was based on the terms of the unsigned agreement, "the very instrument it correctly concluded was unenforceable," and "was in conflict with New York law" (*id.* at 97). Similarly, the proposed terms of the never-executed written subcontract should not stand as an insuperable barrier to Jordan's noncontractual causes of action.

---

granting defendant's motion to dismiss pursuant to CPLR 3211 (a) (1) and (7).

12. In stating that the partial performance by the plaintiff did not "override the expressed intention to be bound by the contract only upon signing by both parties" (*id.* at 97), the court did not suggest that under New York law there were no circumstances under which such an intention could be overridden by the parties.

MARLOW, NARDELLI and BUCKLEY, JJ., concur with FRIEDMAN, J.P.; McGUIRE, J., dissents in a separate opinion.

Order, Supreme Court, New York County, entered July 15, 2005, affirmed, with costs.